JAMES COLUCCI, RESPONDENT, v. EDISON PORTLAND CEMENT COMPANY, APPELLANT.

Argued March 3, 1920—Decided June 14, 1920.

Where an employe during working hours stopped the work which he was employed to perform, left the place where he was employed to perform it, went a hundred yards away into another building of his employer, and deliberately lay down to sleep and slept for three hours until he was accidentally killed—*Held*, that the accident did not arise in the course of his employment within the meaning of the Workmen's Compensation act.

On appeal from the Supreme Court, whose opinion is reported in 93 *N. J. L.* 332.

For the appellant, *William H. Morrow.*

For the respondent, *George M. Shipman.*

The opinion of the court was delivered by

WHITE, J.   This is an appeal from a judgment of the Supreme Court, affirming an award by the Court of Common Pleas of Warren County of compensation under the Workmen's Compensation act to the plaintiff for the death of his twenty-one-year-old son, Leo, upon whose wages plaintiff was proved to be partially dependent. The essential circumstances, or facts, as established by the findings of the Common Pleas Court, and the undisputed testimony, were as follows: Leo, a general utility laborer in defendant's cement works, had been at work before the accident (in accordance with his employment) in shoveling away broken rock or cinders which spilled from a conveyer belt moving through an enclosed tunnel. The work was very trying because of the dust and dirt and of the heat, and it was necessary for the men so employed to go out of their respective tunnels to seek fresh air and rest for a few minutes "now and then," re-entering the tunnel and resuming the shoveling, however, "in five or ten minutes," so

as to prevent an accumulation of the spillings from clogging up the tunnel and stopping the running of the conveyer belt. Leo was working on the night shift, which commenced at six P. M. and ended at seven A. M. Some time between one thirty-four A. M. and two-thirty A. M. he left his tunnel and went to the dryer-house of his employer's plant about a hundred yards away, which house he entered and layed down upon a pile of brick and went to sleep. His time card in the company time clock was punched at one thirty-four A. M., which, if he punched it, would indicate that he terminated his work for that night at that time. There was no evidence as to who punched this card, however, and the learned trial judge made no finding upon this point. At three forty-five A. M. the assistant foreman, Sabo, one of whose duties was to keep the men at their work, found Leo's conveyer clogged with an accumulation of spillings, went to look for him, found him sleeping in the dryer-house, tried to awaken him to get him to go back to his work, but was unsuccessful, and finally went himself and shoveled out the tunnel so the conveyer could run. At about five A. M. Sabo again found this tunnel clogged up and again, himself, shoveled it out, and then at five-thirty A. M. went over to the dryer-house and asked Jim, the fireman, if Leo was still asleep in there, and was told that he was, and said, "Come on, I wake him up and you see some fun," or words to that effect, and took a brick (one witness thought it was an iron bolt) and climbed up some outside tower stairs alongside an adjoining building, and threw the brick down on the corrugated iron roof of the dryer-house so as to make a big noise and to shake the soot and "black stuff" down on the sleeping man in order to give him a scare. This was within a few minutes of quitting time, and Sabo did not wait and tell Leo to get back to work, but ran down the stairs and slipped away so that Leo would not see who it was that played the joke upon him. Sabo was asked on cross-examination if his purpose was not to get Leo back to work, but answered, "Well, it was about quitting time." Unfortunately, there was a rusty hole or weak spot in the roof and the brick struck and went

through it and hit Leo in the stomach so that he died the next day.

Two questions are presented by these facts, namely, Did the accident arise *out of* the employment, and if so, was it *in the course. of* the employment? Both must be answered in the affirmative to warrant the award. *Bryant* v. *Fissell,* 84 *N. J. L.* 72; *Hulley* v. *Moosbrugger,* 88 *Id.* 161.

The learned Common Pleas judge resolved both these questions in the affirmative, but in this respect, so far as his decision was a conclusion of law from established facts, it was subject to review in the Supreme Court, and the affirming judgment of that court is subject to review on appeal here. *Bryant* v. *Fissell, supra; Hulley* v. *Moosbrugger, supra.*

1. Did the accident arise *out of* the employment? This would ordinarily depend upon whether what the assistant foreman, Sabo, did at five-thirty in the morning when he ascended the stairs outside another building and threw the brick on the iron roof under which Leo was sleeping was reasonably within the scope of his employment to keep the men at their work, or whether it was a bit of "horse play," quite outside the confines of that employment. *Hulley* v. *Moosbrugger, supra; Mountain Ice Co.* v. *McNeal,* 91 *N. J. L.* 528. The Supreme Court seems to have taken the view that because Sabo, as assistant foreman, was the immediate superior in authority over Leo, the doctrine of the foregoing cases does not apply. Without expressing any opinion upon this view in its application to cases where the accident occurred because the superior performed a duty which he was employed to perform in a way not reasonably contemplated by his employer, it seems to us quite clear that where the act causing the injury was not only without the contemplated method of performance, but was also entirely outside the scope of the employment itself, the doctrine has full application, irrespective of the fact that the one who caused the injury was superior in authority *within the employment* to the one who was injured. We think, therefore, that if Sabo in throwing the brick was not doing it in order to get Leo to return to his work, but was doing it simply as what seemed an innocent joke to scare

him and to have some fun with him quite apart from his return to work, whether before or after it was time to quit, it was in all essential respects like the "horse play" in *Hulley* v. *Moosbrugger, supra,* or the assault as a result of "horse play" in *Mountain Ice Co.* v. *McNeal, supra.*

If this were all there was in the case it might be necessary to send it back for an express finding of fact upon this point, but our view upon the second point involved renders this unnecessary.

2. Did the accident arise *in the course* of Leo's employment? Of course, if he deliberately stopped work and recorded himself as leaving at one thirty-four A. M., as shown by the time clock, and departed about his own affairs, whether to go to sleep in his own bed at home or on a pile of brick in the defendant's dryer-house, or to do anything else he chose, there could be no recovery, for, obviously, the accident did not arise in the course of the employment. But, assuming that his card in the recording clock was punched through mistake or otherwise by someone else, and that what Leo actually did was not to terminate his shift hours of work, but was simply to stop his work, leave his place of work, go a hundred yards away from it and deliberately lay down to go to sleep, did the accident which caused his death three hours afterward while he continued to sleep and without his having returned to his work, arise in the course of the employment? We think it did not. He had for the time abandoned his employment. It was not a case of an accident resulting from an employe unintentionally falling asleep while performing his work, as in *Dixon* v. *Andrews,* 91 N. J. L. 373, but it was a case of an employe intentionally stopping and leaving his work and going a hundred yards away and deliberately laying down and going to sleep, and remaining asleep away from his work during a period of three hours, during which time he was killed by the accident. It is true that Leo was probably very tired and sleepy. He had been off shift all the day preceding the night of the accident, but the night and day before that he had at his own request (he was paid by the hour) worked both the day and the night shifts in succession. But no

matter how good his reason for leaving his employment may have been, the controlling fact is that.he did leave it, and that the accident to him occurred while he was deliberately away. It did not, therefore, arise in the course of his employment within the meaning of the Workmen's Compensation act.

The judgment is reversed.

*For affirmance*—BLACK, J. 1.

*For reversal*—THE CHIEF JUSTICE, SWAYZE, PARKER, MINTURN, WHITE, HEPPENHEIMER, WILLIAMS, GARDNER, JJ. 8.