# CHARLESTON.

Attie Damron *v.* State Compensation Commissioner

(No. 6822)

Submitted September 3, 1930. Decided September 16, 1930.

*Robert E. White*, for appellant.

*Howard B. Lee,* Attorney General, and *R. Dennis Steed,* Assistant Attorney General, for respondent.

MAXWELL, JUDGE:

This claim was disallowed by the commissioner on the ground that the injury complained of by the claimant "did not occur in the course of and resulting from the employment."

The undisputed facts are that claimant, Attie Damron, was admitted to the employ of the Buffalo Creek Coal & Coke Company as a coal loader on September 26, 1927, but, due to a shortage of men, he was put to work that evening as a helper on a cutting machine. Upon coming out of the mine at about four o'clock the next morning, he went to the electric shop or motor barn which was located about sixty feet from the mine mouth, where he fell asleep. At seven o'clock that morning an electric motor which was being taken into the barn ran over Damron's left foot and injured it so severely that amputation of the left leg a few inches below the knee was necessary.

As to why Damron went to the motor barn in the first instance, there is a conflict of testimony. . He testifies that on the evening of September 26th in a conversation with S. C. Scholl, mine superintendent, and C. P. Woody, mine foreman, he, Damron, objected to working on the machine as a steady job but was requested by Woody to go ahead and work on the machine that night and wait at the shop for him the next morning where he, Woody, would give him an order for checks and arrange for his regular employment of loading coal. This conversation is corroborated in great part by one Jasper Sexton, a fellow worker of Damron's and at whose home Damron stayed. Sexton says that Woody did not say exactly where he would meet Damron in the morning, but that as Damron

started away he, Damron, called back and said he would wait for Woody at the electric shop, to which remark Woody replied that that was all right.

R. L. Johnson testifies that a short time after the accident Woody told him that he had told Damron to wait for him in the electric shop. Wm. Osborn who was present with Johnson at the time of this conversation testifies to the same effect. This covers the testimony for claimant as to why he went to the shop.

As to the events preceding the accident, Damron says he came out of the mine at about four o'clock, asked R. L. Blankenship, night man in charge of the shop, if he could go into the shop, and was told by Blankenship to go in and lie down. This he did and went to sleep and avers that he knew nothing until the accident occurred.

In conflict with this testimony, Woody says that Damron had no arrangement to meet him at the electric shop on the morning of September 27, 1927, and that he does not know why Damron went there. He further says that no one was allowed to loaf in the motor barn, and it was not customary for the machine men to come there after they had finished their shift. He testifies that he found Damron asleep in the shop at about six thirty-five o'clock lying along the track, and that he tried to arouse him and told him to get up and go out as he would get hurt, but that Damron after rising up "hunkered" down again. He further testifies that after the accident he asked Damron why he wanted to lie down again after being aroused, and Damron said that he did not recall being awakened.

Scholl, the mine superintendent, does not testify as to the alleged conversation on the evening of September 26th between him and Woody and Damron, but he does say that when he went to Damron immediately after the injury and asked him why he had not gone home with the machine men, Damron replied in substance that he did not know whether Jasper Sexton had gone home or not and that he did not like to go to his room in the Sexton home at that time of night. A. B. Tilley, the machine cutter with whom Damron worked that night, says that Damron went to sleep on the cutter bar of the machine,

and that he tried to arouse him and get him to accompany him from the mine but that Damron would not go. R. L. Blankenship, the night man at the shop, testifies that he went to the mine mouth, and. aroused Damron from the cutter bar, whereupon Damron asked him if anyone was in the shop. Blankenship told him no. He further testifies that he later found Damron asleep in the shop with his feet across the track, and he asked him to get up so that he could shift the motors; that Damron got up but when he, Blankenship, returned later to get his dinner bucket, Damron was still asleep, and that he aroused him again and asked him to go off the hill with him, and Damron said all right but did not go.

In seeking a proper solution of the question as to whether claimant's injury was received by him while in the service of his employer, a primary inquiry is whether claimant went to the motor barn in compliance with an arrangement with the mine foreman with reference to claimant's employment. In the light of the above recited testimony, it would be difficult to resolve the issue on this matter in favor of claimant. If he had in fact gone to the motor barn in pursuance of an arrangement with the mine foreman, the high probability is that following the injury, in reply to superintendent Scholl's inquiry as to why he had not gone off the hill, he would have replied in substance that he had remained on the hill, at the motor barn, in pursuance of his arrangement with the mine foreman to see him there in the early morning, and would not have said that the reason that he had not left the hill was that he did not desire to return to his landlord's home at that early hour. It seems almost inconceivable that under such circumstances the claimant would not have given the true reason; yet he would have us now believe that he did not give the true reason. This strongly supports the commissioner's adverse finding. It is unlikely, too, that a mine foreman would undertake to arrange with a workman whom the foreman knew would in all probability be leaving the night shift in the very early hours of the morning to wait three or four hours to see him (the foreman) about a matter which required only informal attention and could be attended to at a later hour in the day. The commis-

sioner's adverse finding is not only backed up by these circumstances but is likewise predicated on appreciable testimony already narrated. Such a finding should not be disturbed by this Court. *Kincannon* v. *Ott*, 108 W. Va. 428, and cases cited.

Many cases are found in the books dealing with accidents which happened to employees while asleep. Some of the cases which have been examined were decided in favor of the claimants, other against them. In those cases where the injury befell the claimant while he was asleep as a direct incident of his employment, compensation was allowed, but in those cases where the sleep was not an incident of the employment but was indulged in by the claimant out of the line of his duty, he was not allowed compensation.

The following two cases of *Dixon* v. *Andrews*, (N. J.) 103 Atl. 410, and *Cleveland* v. *Rice*, (N. Y.) 147 N. E. 182, are typical of that class in which compensation should be allowed. In the *Dixon* case the facts and the holding of the court are outlined in the syllabus as follows: "On August 15, 1916, the husband of the petitioner was a farm hand, whose particular employment on that day was to make a trip to Philadelphia with a truck wagon drawn by a team of mules. He left the farm between 5 and 6 o'clock in the afternoon, and at 2 o'clock the next morning was found dead sitting on the seat of the truck with his body crushed between the seat and the overhanging roof of a shed under which the mules were standing. From the circumstantial details in evidence, the judge of the pleas determined that the decedent's death was caused by an accident and that such accident arose out of and in the course of his employment." And in the *Cleveland* case the facts are thus stated in a *per curiam* opinion: "Claimant was employed by a livery-stable keeper at Cuba, N. Y., to convey with a horse and cutter a passenger for a distance of five miles. On the homeward trip claimant was thrown from the cutter and the horse, making its escape, returned unattended to the stables with the cutter, both uninjured. Claimant wrapped himself in a buffalo robe, which had fallen from the cutter, and sat down in the snow to wait for a vehicle that might by chance be passing and whereby he might procure his return to Cuba.

The time was about 1 o'clock a. m. He unintentionally fell asleep. Several hours thereafter he was discovered by a resident of a house in the immediate vicinity and was by him conveyed to his destination. Later in the day he discovered that his left foot had been frozen. It was subsequently amputated, and for the loss thereof the award in question has been made. The question was whether the loss of the foot was an injury arising out of and in the course of the employment." The award made by the Industrial Board was affirmed. Analogous to those two cases is the case of *Holt Lumber Co.* v. *Industrial Commission of Wisconsin*, (Wis.) 170 N. W. 366, wherein the gist of the case appears as follows from point 2 of the syllabus: "Where a workman, employed in a logging camp, was required to sleep in a bunk furnished by the employer, and was there injured by a straw falling from an upper bunk lodging in his throat, the injury grew out of and was incidental to his employment within the meaning of St. 1917, secs. 2394-3, subd. 2." This case is cited as typical although at the time the straw became lodged in claimant's throat he was not asleep.

Typical of the cases disallowing compensation in situations where claimants were injured in their sleep are *Colucci* v. *Edison Portland Cement Co.*, (N. J.) 111 Atl. 4; *State Treasurer* v. *Cohen, et al.*, 195 N. Y. S. 82, 202 App. Div. 769; in the matter of *Brisken* v. *Hyman*, (N. Y.) 142 N. E. 268; *Guiliano* v. *O'Connell's Sons*, (Conn.) 136 Atl. 677. In the *Colucci* case, claimant was employed as a general utility laborer in a cement works. He was on the night shift which ended at seven A. M., but about 1:30 he left his work, went to another building of his employer 100 yards away, and went to sleep. At about 5:30 A. M. he was injured by some "horse play" of his companions from which injury he died the next day. Although his time clock was punched at 1:34 A. M., it was not shown who punched it so that the question of whether he had actually terminated his work for that night was not decided by the trial judge. Regarding that question, however, and the final question as to whether claimant's injury arose in the course of his employment, the appellate court held: "Did the accident arise in the course of Leo's employment? Of course,

if he deliberately stopped work and recorded himself as leaving at 1:34 A. M., as shown by the time clock, and departed about his own affairs, whether to go to sleep in his own bed at home, or on a pile of brick in the defendant's dryer house, or to do anything else he chose, there could be no recovery, for obviously the accident did not arise in the course of the employment. But, assuming that his card in the recording clock was punched through mistake or otherwise by some one else, and that what Leo actually did was not to terminate his shift hours of work, but was simply to stop his work, leave his place of work, go 100 yards away from it, and deliberately lie down to go to sleep; did the accident which caused his death three hours afterward, while he continued to sleep and without his having returned to his work, arise in the course of his employment? We think it did not.''

In the *Guiliano* case it was held that injuries to workmen engaged in building a road, by a fire in a barn in which they slept, did not arise out of employment, although the barn was rented by the employers to provide sleeping quarters for the men; it appearing that the use of the barn for sleeping was entirely optional with the men and that the fire occurred long after employment had ceased. The court held: ''Nor have we found case or authority which has held that an employee, who at his own option, after his day's work is ended, is upon his employer's premises, by the permission of the employer, is while there within the scope of his employment so that his employer would be held liable to pay him compensation for an injury then happening to him. An employee in such a voluntary situation could not be held to be engaged in the employment of his employer, or in that which was incidental thereto, without abandoning the definition of when an injury arises in the course of an employment which we adopted in *Larke* v. *Hancock Mutual Life Insurance Co., supra,* and have ever since adhered to. The creation of a liability upon employers upon their granting optional privileges to their employees, such as in this case, would, we fear, have the unfortunate effect of deterring employers from granting any privilege to their employees.''

So, also, in the *Briskin* case where the temporary manager of a garage died as a result of burns received in a fire which destroyed the garage about 2:30 A. M., the evidence showed that claimant chose to sleep in the garage rather than take a long journey home. It was held that claimant was not engaged in the regular course of employment when the fire occurred.

An award was refused in *State Treasurer* v. *Cohen et al.,* *supra,* it being found that the employee had gone to the work-room for the purpose of resting or sleeping and had there been killed.

In the case at bar, three hours had elapsed from the time claimant had finished the shift upon which he was engaged until the time of the accident. After completing the shift, claimant was at liberty to go about his own affairs, and, in fact, did go about his own affairs, and in pursuing his own affairs, sought opportunity to sleep. We can perceive no difference in principle whether he sought opportunity to sleep on the premises of his principal, on the premises of a third person or in his own bedroom. It was not in the line of his work nor in conformity with any arrangement which had been made for him by his master. Though his drowsiness and the consequent injury may have resulted from the employment, it certainly cannot be said that such injury occurred in the course of the employment. Both elements must concur. The statute uses the conjunctive and not the disjunctive. An injury to be compensable must be received "in the course of and resulting from" the employment. Code, Chapter 15 P, sec. 25. See also 28 Ruling Case Law, p. 802.

In the light of the foregoing, we are of opinion to affirm the finding of the commissioner.

*Affirmed.*