J. E. Scott *v.* State Compensation Commissioner *et al.*

(No. 7328)

Submitted September 14, 1932.    Decided October 11, 1932.

*Simms & Staker,* for appellant.

*Howard B. Lee,* Attorney General, and *R. Dennis Steed,* Assistant Attorney General, for respondent.

Lively, Judge:

Petitioner J. E. Scott, employed as an oil well driller, was injured on March 30, 1925, by the breaking of a drilling cable. An original award of 78 weeks' compensation was increased as follows:

| Date | Percentage of Disability | Number of Weeks. |
|---|---|---|
| October 26, 1926 | 35% | 140 |
| January 12, 1928, increased to 68% | | 272 |
| October 25, 1930, increased to 83% | | 332 |

Compensation expired on August 16, 1931; and on September 11, 1931, the commissioner notified petitioner that he had been fully compensated, and that his claim was closed. Upon protest by petitioner's counsel in his behalf, a hearing (under Official Code, ch. 23-5-1) was had, and on March 9, 1932, the

commissioner notified claimant of an order, entered March 4, 1932, wherein he concluded that Scott is not totally and permenantly injuréd and refused further compensation. Upon review before this court, the commissioner's finding is the main point of controversy.

Claimant, 51 years of age at the time of his injury, was employed as a well driller, earning ten dollars a day. An examination made on April 27, 1926, by the medical examiner of the compensation department shows (1) that claimant's right eye has been enucleated, (2) a simple fracture of the right femur through the trochanter, (3) fractures of bones about left and right orbit, (4) movements about the hip joint are very limited, (5) two-inch shortening of the right leg, and (6) considerable deformity about the face. On October 21, 1926, an x-ray examination by Dr. A. C. Lambert disclosed that "there is a transverse fracture of the head of the right femur. The shaft of the bone is dislocated upward and there is apparently non-union." A subsequent x-ray examination by Dr. Lambert on September 10, 1931, with reference to this fracture shows "the shaft of the bone is displaced upward and the surgical neck has healed to the shaft of the right femur in the region of the lesser trochanter." On the same date, the medical examiner for the compensation commissioner found that "clinical examination would lead one to believe that union is not as firm as it was when he was first seen in this department some two or three years ago." The medical examiner found also atrophy of the right thigh and of the calf of the right leg. On December 30, 1931, Dr. H. D. Hatfield examined him and found that "the reprint taken of the hip joint discloses an un-united fracture which was evidently sustained though the neck of the femur. * * * there is a great deal of atrophy of the entire limb from hip to foot." His examination shows that claimant's left eye reacts sluggishly to light and accommodation"; also that "the patient complains of pain in his neck which radiates to the front involving his right mastoid and giving him pain throughout the entire facial area." According to Dr. Hatfield, "this neuralgia can, no doubt, be account-

610

ed for because of the pressure of the dislocated and broken bones of the face and head on the normal openings through which the cranial nerves find their exits to supply the tissues and bones with sensation.'' The non-union of the hip fracture has resulted in the shortening of his right leg about two inches, prevents claimant from placing any weight thereon, and necessitates the use of crutches. The examination of the department's medical examiner on August 21, 1930, states: ''Claimant has made his maximum improvement and condition has not changed any since former examinations.''

At the hearing held on November 6, 1931, Dr. J. A. Guthrie testified that claimant had been brought to his hospital about March 30, 1925, that he had observed him from that date until the hearing, that Scott has a partial ankylosis of the hip, arthritis in his leg that keeps him awake at night and necessitates the use of a hospital bed for sleeping, that claimant is unable to walk without the aid of crutches, and that in his opinion, Scott is totally and permanently disabled from performing any remunerative employment. Dr. Wm. F. Beckner, an eye specialist, testified that claimant is totally blind in his right eye, and, without glasses, does not have normal vision in his left eye. In Dr. Beckner's opinion, claimant could do no work other than merely looking after his personal duties.

After the hearing, claimant was examined by Drs. J. R. Shultz, John E. Cannady, and J. Ross Hunter. Each of these doctors was of the opinion that claimant could perform some kinds of work other than his occupation as driller. Dr. Hatfield stated ''there is no doubt of his permanent disability which is total and complete so far as the particular type of work that he has carried on for a livelihood during his entire life.'' He ventures no assertion on claimant's ability to do other work.

The record discloses that claimant is able to perform light work about his house. He is able also to drive his car, but he stated that he must drive carefully and that if he drives for any appreciable time, he suffers a physical reaction. Under such testimony, can this court say that the commissioner

was unwarranted in his finding that claimant is not totally and permanently injured?

Under our workmen's compensation laws determination of permanent disability falls within the jurisdiction of the compensation commissioner in all cases, except three instances which are conclusively presumed to be total, viz: loss of both eyes or the sight thereof; loss of both hands or the use thereof, and any injury resulting in practically total paralysis (Code 1931, ch. 23-4-6 (j); and under subdivison (c) of the same section, provision is made, in cases of permanent disability, for determining the percentage of disability to total disability and the award of compensation allowed. Awards for permanent disability from 2% to 85% are computed on the basis of four weeks' compensation for each per cent of disability allowed; while for disability in excess of 85%, compensation of a maximum of $16.00 per week during the lifetime of the injured employee is allowed. That claimant's ability to earn has been seriously affected is recognized by the award of compensation on the basis of 83% disability. There is no dispute that claimant cannot resume his former occupation; but there is a conflict in the professional opinions of doctors who have examined the injured workman. The doctor who has attended and observed claimant since his injury in 1925 is emphatic in his opinion that claimant is totally and permanently disabled from remunerative employment. Three doctors, who examined claimant in January, 1932, believed him able to engage in many compensative occupations.

While we are impressed with the expert opinions of those physicians who concluded that Scott could engage in many compensative occupations, it is pertinent that all fail to nominate the work which claimant might do. From observation and treatments over a period of approximately seven years, Dr. Guthrie concludes that claimant can do no work. Such an opinion is deserving of particular weight. With similar experience with Scott, possibly the other physicians would have been of the same opinion. As depicted by the record—crippled and unable to walk without the aid of crutches, one eye enucleated and the other weakened—it

is difficult to see how claimant might engage in employment other than an occasional odd job, given through charity or sympathy. Under the evidence as above shown, we are of the opinion that claimant is totally and permanently injured within the meaning of the statute.

Counsel for the commissioner directs attention to the fact of the 83% disability awarded, 33% is for the enucleated eye and 50% for the injured leg, which represents, according to counsel, a 91% disability to the leg. While it is true that subdivision (g) of the compensatory statute, cited above, provides that in determining permanent disabilities (other than those specifically set out in enumerated subdivisions) the commissioner should use as a basis the loss of an arm at or above the elbow, we are not impressed with the theory of ascertaining total incapacity by the method of accumulative disabilities. The degree of diminished earning capacity occasioned by the loss of two members, or more, in many instances would exceed the aggregate award of disability percentages.

The case will be remanded for compensation in accordance with the tenor of this opinion.

*Reversed; remanded.*