Shirley Ann Staubs, *Widow* of Fred T. Staubs

*v.*

State Workmen's Compensation Commissioner
*and*
National Fruit Product Company, Inc.

(No. 12819)

Submitted April 29, 1969.          Decided July 15, 1969.

*Rice, Hannis, Rice & Wagner, Lacy I. Rice, Jr.,* for appellant.

*Archibald McDougall,* for appellee.

338

HAYMOND, PRESIDENT:

This claim of Shirley Ann Staubs, for dependent benefits provided by statute, as the widow of Fred T. Staubs, deceased, a former employee of National Fruit Product Company, Inc., was denied by the State Workmen's Compensation Commissioner, by order entered June 14, 1968. Upon appeal by the claimant, the Workmen's Compensation Appeal Board, by order entered January 8, 1969, reversed the order of the commissioner and held the claim to be compensable. From that order of the appeal board this appeal was granted upon the petition of the employer.

Other than the evidence of medical witnesses, which is conflicting, there is little if any dispute in the remaining material facts, and the controlling question for decision is whether the evidence shows that the death of Fred T. Staubs resulted from an injury suffered by him in the course of and resulting from his employment, as provided in Section 10, Article 4, Chapter 23, Code, 1931, as amended.

To reverse the order of the appeal board the employer, National Fruit Product Company, assigns as error the failure of the claimant to show by satisfactory evidence that the death of Fred T. Staubs occurred in the course of and resulted from his employment; the findings of the appeal board are not supported by the evidence; and, as claim for compensation benefits was filed by Fred T. Staubs before his death and was denied shortly after his death by order of the commissioner entered March 10, 1966, from which no appeal was taken, the claim of the widow is barred by the doctrine of res judicata.

Fred T. Staubs, twenty-nine years of age, married and the father of four infant children at the time of his death, died from a self-inflicted gunshot wound on February 16, 1966. The death certificate, dated February 17, 1966, listed destruction of brain due to rifle shot as the cause of death. He had been employed as a general orchard

worker of the employer at Gerrardstown, West Virginia, from May 6, 1962 to August 30, 1965. The character of his work varied with the seasons and at different times he was engaged in spraying, pruning and cultivating the orchard at which he was employed. Before his employment at the orchard he had worked for about fifteen years on a farm of his brother-in-law Howard G. Demory near Charles Town, West Virginia.

After quitting his employment on August 30, 1965, he accepted other employment with a construction company in or near Washington, D. C. Though he was exposed to chemicals and poisons during his employment with the National Fruit Product Company, there is no evidence that he was exposed to chemicals or poisons by participating in any spraying operation after he terminated his employment with that company on August 30, 1965. After he had worked four days with the construction company he became mentally ill for the first time, returned to his home and did not at any time resume employment with his former employer. As a result of his illness he became irrational, engaged in violent and bizarre conduct which resulted in his admission to Weston State Hospital at Weston, West Virginia, on September 5, 1965. His condition, when admitted, was described by a physician as unpredictable, irrational, terribly disturbed and combative. The tentative diagnosis was schizophrenic reaction, acute undifferentiated type, and he was transferred to the intensive therapy unit as soon as he became quiet. His condition was similarly described on the following day by another physician who recorded the same tentative diagnosis. He was treated and remained in the hospital for a period of thirteen days and, his condition having improved, he was discharged on September 18, 1965 and he returned to his home on that day. Ten days later, on September 28, 1965, his mental illness having recurred, he was brought to the hospital by a deputy sheriff and readmitted as a patient, his hospitalization having been directed by Doctors John J. Palkot and Frank A. Hamil-

ton, of Martinsburg, West Virginia, who examined him and found him to be mentally ill and a proper subject for care and treatment in a hospital for the mentally ill and that he was dangerous to himself and others and required immediate hospitalization. The readmission note of the physician who admitted him to the hospital on September 28, 1965, stated that the patient was very disoriented, agitated, restless and disturbed, made much noise during the interview, and that it was difficult to obtain information from him because he was disorganized in his speech, and was hallucinated and delusional; and the physician recommended that the previous diagnosis of acute brain syndrome of unknown cause, at the time he was discharged on September 18, 1965, should be continued. On October 1, 1965, a physician at the hospital in a report of a preliminary examination stated that Staubs was still delusional during an interview. On October 23, 1965, another physician at the hospital recorded diagnostic impression of schiozphrenic reaction, paranoid type.

On January 9, 1966, a physician at the hospital reported that the patient's mental condition was much improved; that he had been working in ward 11 kitchen for more than a month; and that during the interview he was cooperative and friendly. The report also stated that Dr. Andia, another hospital physician, made a neurological examination and found the patient to be suffering from lead poisoning. A report by the hospital staff on January 11, 1966, signed by the superintendent, Dr. Cornelia B. Wilbur, stated that on October 28, 1965, the patient had been seen by the medical staff and that the diagnosis was acute brain syndrome associated with drug or poison intoxication with psychotic reaction, and that during an interview it appeared that the patient had improved considerably, was friendly, cooperative, coherent and relevant, that the prognosis was good and that his discharge was recommended. After a stay of 105 days in the hospital, his condition being improved, he was discharged January 13, 1966 and he returned to his home on that day.

After his return from the hospital in January 1966, he resumed and continued to work on his brother-in-law's farm until the day of his death on February 16, 1966.

According to the testimony of the widow "he acted all right for a couple of days" and then he became depressed; "He just didn't know what to do with himself because he didn't have a job and he was scared he couldn't support the family and finally he started working for Howard Demory." She further testified that on the morning of the day of his death he did not want to go to work because of the wintry weather which he feared might cause an automobile accident. He went back to bed after the oldest girl had left for school. After he arose and came downstairs, he and his wife engaged in conversation in which he said that "he would be better off dead"; that he then got his gun and held it to her head and asked her if she wanted to die with him. She replied in the negative and said that they had to live for their children and he replied "By George, you're right." He put the gun away and after a short delay, went upstairs, got his 30-30 deer rifle and "shot his head off." His wife ran upstairs and found him lying on the floor.

While Staubs was employed by National Fruit Product Company from March 5, 1962 to August 30, 1965, he was assigned to operate a tractor or caterpillar which was used at times to pull a sprayer through the employer's orchard. He performed this type of work for a period of twenty-four days during each year and the sprayer, when pulled through the orchard, contained numerous chemicals, some of which were insecticides and others were fungicides. Among these chemicals were cyprex, parathion, guthion,—very toxic poisons,—tedion, lead, sevin, fermate, phaltan, and endrin. No endrin, however, was used in 1965 until after Staubs quit his employment, and lead was used only once, on May 8, 1965, which was nearly four months before he became ill the following September. The chemicals used were diluted on the basis of 100 gallons of water to ½ pound of chemicals and were

mixed by an agitator in a closed tank for that purpose, from which the spray mixture was transferred to the sprayer by a twelve or fourteen foot hose connection. The trailer sprayer connected to the tractor or caterpillar was approximately 17½ feet in length and the opening from which the spray was emitted was at the extreme rear of the sprayer. The tractor was not equipped with a cab but it had controls which enabled the driver to stop the spray but not to regulate its quantity. In the operation of the sprayer the driver of the tractor was at all times in front of the spray which did not come in contact with him unless the direction of the wind should change, in which event the spray would come in contact with the clothing and parts of the body of the driver. The spraying materials were mixed by other employees but not by Staubs, although there is some testimony that he did on one occasion participate in mixing the spray and that on other occasions he was present at the place where the mixture occurred which, according to the testimony of the widow, was about 150 feet from their home in the orchard. She also testified that her husband intended to move from their home in the orchard because he could not stand the spray any longer; that it made him sick at his stomach and on one or two occasions caused his nose to bleed; that he said that sometimes his head hurt, his nose was stopped up and the food he ate tasted like the spray; and that his clothing would be wet from the spray which got on parts of his person. As the driver of the tractor Staubs was furnished with protective clothing, consisting of one or two rubber raincoats, rubber pants, a hat and rubber gloves, which he wore except when he removed them because of the heat, but he was not supplied with goggles or a respirator. There is also testimony that he suffered at times from headaches and that on one occasion he collapsed while driving a tractor. There is, however, no evidence that he at any time came in contact with or received internally any of the chemicals in their concentrated form by inhaling or swallowing any

of them, and that the chemicals which came in contact with his clothing or parts of his body were diluted and in the form of a spray.

The principal expert witnesses in behalf of the claimant with respect to the cause of the death of Staubs were Francis Silver, V., and Dr. Cornelia B. Wilbur. Silver, who is not a medical doctor but an environmental engineer, was well acquainted with chemicals used in warfare and with the composition and characteristics of the chemicals used in the spray program of the employer, but he admitted that he had seen only a few cases of chronic intoxication from exposure to spray materials of the kind used in the spray program of the National Fruit Product Company and that the victims had become sick and suffered from painful joints and were irritable but that death did not result in any of those cases. When asked if he could say whether the death of Staubs resulted from his employment with the National Fruit Product Company he stated that there was a 50% to 75% probability that there was a connection between his employment and his death. This witness was familiar with the protective policy of the orchard industry, was critical of the policy, and expressed the view that the program of protecting orchard workers carried out by the employer and by the industry in general was inadequate, particularly in failing to provide goggles and respirators.

Dr. Cornelia B. Wilbur, who became superintendent of the hospital at Weston October 16, 1965, more than a month after Staubs was first admitted on September 5 of that year, and occupied that position while he continued to be a patient, expressed the opinion that his exposure to and contact with chemical sprays during his employment with National Fruit Product Company produced an acute brain syndrome, which caused him to become mentally ill. Though by implication she indicated that there was a casual relationship between his death and his employment, nowhere in her testimony did she directly express an opinion that his death resulted from his em-

ployment. Though Dr. Wilbur was well qualified as a medical doctor, there is no evidence to show that she had ever had any clinical or practical experience in the field of lead poisoning or with respect to the toxic effects produced by the chemicals used by the employer in its spray program or that she had ever treated any cases involving such chemicals. Her conclusion was based principally upon her own individual studies and research instead of clinical experience or actual practice and her studies and research were prompted by her interest in orchard spraying programs. With reference to her activities she said in her testimony: "I think I very well have something new to say in terms of chronic poisoning." What she did conclude, however, was contrary to the opinions of all the other witnesses who testified in the case except the opinion of the witness Silver. Though the claimant insists that Dr. Wilbur was the physician who treated Staubs, there is no evidence that she gave any specific treatments or that she saw Staubs, while in consultation or otherwise, more than twice. Her diagnosis of an acute brain syndrome, associated with drug or poison intoxication and with psychotic reaction, was in direct conflict with the opinions of the two local physicians who examined and certified him for hospitalization, with the opinions of at least two of the physicians who examined him at the Weston hospital and with the opinions of three widely recognized medical experts with wide clinical and practical experience in toxicology and psychiatry, who testified as witnesses in behalf of the employer. In reaching her conclusion Dr. Wilbur attached considerable importance to the opinion of one of the staff physicians that Staub suffered from lead poisoning which was based largely on the bluish discoloration of the gums of his teeth, although the evidence shows that his exposure to lead was negligible and occurred only once during the year 1965 and that such exposure occurred on May 8, which was approximately four months before he became mentally ill, and the theory that he suffered from lead poisoning was completely

refuted by the testimony of Dr. Kehoe, a recognized authority in that field.

Dr. Robert M. Clyne, a recognized medical authority with experience of many years in the chemical field and who, as the medical director of the American Cyanamid Company, which manufactures cyprex and parathion, was familiar with the toxic effects of these chemicals and basing his opinion on the material facts disclosed by the evidence, testified that there was no casual relationship between the death of Staubs and his employment by National Fruit Product Company. Dr. Clyne rejected the theory of Dr. Wilbur that Staubs suffered from chronic chemical intoxication and stated that "There is no such thing as chronic phosphate intoxication."

Dr. Robert Kehoe, a medical graduate of the University of Cincinnati and an outstanding and experienced authority on lead poisoning, a witness in behalf of the employer, basing his opinion upon the material facts disclosed by the evidence, contradicted and rejected the conclusion of Dr. Wilbur and Silver as to the toxic effects of lead and of the other chemicals used in the spray program of National Fruit Product Company.

Dr. John Marshall, a graduate of Georgetown University and Chief of the Out-patient Clinic of a hospital in Washington, D. C., and an experienced psychiatrist, basing his opinion upon the material facts disclosed by the evidence, rejected Dr. Wilbur's diagnosis that Staubs suffered from an acute brain syndrome associated with drug or poison intoxication with psychotic reaction, and testified that in his opinion Staub represented a schizophrenic reaction of an acute undifferentiated type, and that he had become unable to function because of his own inadequacies, had become lost with reality, had experienced hallucinations and delusions, that as his condition continued to degenerate he became more confused and unable to function to the extent that he required hospitalization, and in his opinion Staubs' "condition had

nothing to do at all with his exposure to the spray materials" used in the spray program of the National Fruit Product Company.

The claimant in a workmen's compensation proceeding has the burden of proving his claim. *Bilchak v. State Workmen's Compensation Commissioner*, 153 W. Va. 288, 168 S. E.2d 723; *Meade v. State Compensation Commissioner*, 147 W. Va. 72, 125 S. E.2d 771; *Williams v. State Compensation Commissioner*, 127 W. Va. 78, 31 S. E.2d 546. An award of compensation can not be made in a workmen's compensation case unless it is supported by satisfactory proof that the employee sustained an injury in the course of and resulting from his employment. *Bilchak v. State Workmen's Compensation Commissioner*, 153 W. Va. 288, 168 S. E.2d 723; *Emmel v. State Compensation Director*, 150 W. Va. 277, 145 S. E.2d 29; *Deverick v. State Compensation Director*, 150 W. Va. 145, 144 S. E. 2d 498; *Hayes v. State Compensation Director*, 149 W. Va. 220, 140 S. E.2d 443; *Damron v. State Compensation Commissioner*, 109 W. Va. 343, 155 S. E. 119. Though the general rule in workmen's compensation cases is that the evidence will be construed liberally in favor of the claimant, *Vento v. State Compensation Commissioner*, 130 W. Va. 577, 44 S. E.2d 626; *Fulk v. State Compensation Commissioner*, 112 W. Va. 555, 166 S. E. 5, the rule does not relieve the claimant of the burden of proving his claim and it can not take the place of proper and satisfactory proof. *Bilchak v. State Workmen's Compensation Commissioner*, 153 W. Va. 288, 168 S. E.2d 723; *Emmel v. State Compensation Director*, 150 W. Va. 277, 145 S. E.2d 29; *Deverick v. State Compensation Director*, 150 W. Va. 145, 144 S. E.2d 498; *Hayes v. State Compensation Director*, 149 W. Va. 220, 140 S. E.2d 443; *Turner v. State Compensation Commissioner*, 147 W. Va. 145, 126 S. E.2d 379; *Williams v. State Compensation Commissioner*, 127 W. Va. 78, 31 S. E.2d 546.

From the entire evidence, including the evidence of expert witnesses who testified in behalf of the claimant and the employer, respectively, and particularly from the evidence as to the character of Staubs' exposure to the chemicals used in the spraying program of the employer, the time that elapsed between his last exposure to the chemicals and the occurrence of his mental illness after his short employment in the Washington, D. C. area, his improvement from his mental illnesses after his hospitalization at Weston, his mental attitude of discouragement and confusion as expressed by him to and testified by his wife, the symptoms which he exhibited during his employment at the orchard and the lapse of time between his last discharge from the hospital on January 13, 1966 and his death by a self-inflicted rifle shot on February 16, 1966, it is clear that his death did not occur in the course of and as the result of his employment with National Fruit Product Company, and that the claimant has failed to satisfy the requirement of the burden of proving the claim by proper and satisfactory proof.

Though the finding of the appeal board is entitled to great weight and when based on conflicting evidence will not ordinarily be disturbed upon appellate review, this Court has held in many cases that an order of the compensation appeal board which is plainly wrong will be reversed and set aside by this Court. *Kennedy* v. *State Compensation Director*, 150 W. Va. 132, 144 S. E.2d 509; *Buckalew* v. *State Compensation Director*, 149 W. Va. 239, 140 S. E.2d 453; *McGeary* v. *State Compensation Director*, 148 W. Va. 436, 135 S. E.2d 345; *Kamensky* v. *State Compensation Commissioner*, 148 W. Va. 258, 134 S. E.2d 582; *Hoff* v. *State Compensation Commissioner*, 148 W. Va. 33, 132 S. E.2d 772; *Nottingham* v. *State Compensation Commissioner*, 148 W. Va. 1, 132 S. E.2d 553; *Meade* v. *State Compensation Commissioner*, 147 W. Va. 72, 125 S. E.2d 771; *Flynn* v. *State Compensation Commissioner*, 141 W. Va. 445, 91 S. E.2d 156; *Morris* v. *State Compensation Commissioner*, 135 W. Va. 425, 64 S. E.2d 496; *Walk* v.

*State Compensation Commissioner,* 134 W. Va. 223, 58 S. E. 2d 791; *Miller* v. *State Compensation Commissioner,* 130 W. Va. 771, 45 S. E.2d 249; *Estep* v. *State Compensation Commissioner,* 130 W. Va. 504, 44 S. E.2d 305; *Manning* v. *State Compensation Commissioner,* 124 W. Va. 620, 22 S. E. 2d 299; *Rasmus* v. *Workmen's Compensation Appeal Board,* 117 W. Va. 55, 184 S. E. 250; *Wills* v. *State Compensation Commissioner,* 114 W. Va. 822, 174 S. E. 323; *Scott* v. *State Compensation Commissioner,* 112 W. Va. 608, 166 S. E. 274.

In *Haines* v. *Workmen's Compensation Commissioner,* 151 W. Va. 152, 150 S. E.2d 883, this Court held in point 3 of the syllabus that an order of the workmen's compensation appeal board which is not supported by the evidence and which for that reason is plainly wrong will be reversed by this Court on appeal.

As a ground for reversal the employer contends that the instant claim of the widow of Fred T. Staubs is barred by the doctrine of res judicata because of the denial by the state compensation commissioner on March 10, 1966 of a claim for compensation filed by Fred T. Staubs in his lifetime and which was not disposed of by an adverse order denying compensation until approximately one month after his death on February 16, 1966. There is no merit in that contention. His claim for compensation and the claim of the widow for benefits for herself and her children as his dependents are separate and distinct claims and her claim is not derived from or dependent upon the outcome of the claim filed by her husband. *Terry* v. *State Compensation Commissioner,* 147 W. Va. 529, 129 S. E.2d 529; *Gibson* v. *State Compensation Commissioner,* 127 W. Va. 97, 31 S. E.2d 555. In the *Gibson* case this Court held in point 1 of the syllabus that "A claim for death benefits, provided for by Code, 23-4-10, is separate and distinct from an injured employee's claim for disability benefits." In the opinion in that case this Court said: "The claim for disability benefits, provided by Code, Chapter 23, and the claim for death benefits are not the

same, nor is a claim for the latter a derivative one. The concept of privity between the two types of claims was negatived in *Lester* v. *Compensation Commissioner,* 123 W. Va. 516, 16 S. E.2d 920, ." To constitute res judicata there must be concurrence of these four conditions: Identity in the thing sued for; identity of the cause of action; identity of the persons and the parties to the proceeding; and identity of the quality in the persons for or against whom the claim is made. *Collins* v. *Treat,* 108 W. Va. 443, 152 S. E. 205; *Barnett* v. *Wolfolk,* 149 W. Va. 246, 140 S. E.2d 466; *Daugherty* v. *Ellis,* 142 W. Va. 340, 97 S. E.2d 33; *Hannah* v. *Beasley,* 132 W. Va. 814, 53 S. E.2d 729; *Carper* v. *Montgomery Ward and Company,* 123 W. Va. 177, 13 S. E.2d 643; *Marguerite Coal Company* v. *The Meadow River Lumber Company,* 98 W. Va. 698, 127 S. E. 644. The identity in the thing sued for; the identity of the cause of action; and the identity of the person and the parties to the proceeding are not present with respect to the claim of the widow of Fred T. Staubs for benefits as his dependent and his claim for disability benefits and the absence of these identities with respect to both claims renders the doctrine of res judicata inapplicable to the present proceeding.

As the order of the Workmen's Compensation Appeal Board reversing the final order of the commissioner and awarding compensation benefits to the claimant and her children is contrary to the preponderance of the evidence and is without evidence to support it and in consequence is clearly wrong, it must be and it is reversed and set aside, and this proceeding is remanded to the commissioner with directions to dismiss the claim.

*Reversed and remanded with directions.*