HUSTON WOODROW MEADOWS

*v.*

WORKMEN'S COMPENSATION COMMISSIONER

*and* FMC CORPORATION

(No. 13354)

Submitted September 11, 1973.  Decided October 30, 1973.

Dissenting Opinion October 30, 1973.

*George G. Burnette, Jr.* for appellant.

*Jackson, Kelly, Holt & O'Farrell, David D. Johnson* for appellee.

NEELY, JUSTICE:

This is an appeal from a final order of the Workmen's Compensation Appeal Board, dated January 29, 1973, affirming the Workmen's Compensation Commissioner's ruling of April 26, 1972, which rejected the appellant's claim for benefits. The appellant asserted before the Commissioner and the Appeal Board that he had suffered an aggravation of a pre-existing condition of pneumoconiosis because of an exposure to a dust hazard while employed by the FMC Corporation in its sheet metal department. Under the facts as developed at a hearing, the Appeal Board ruled that "there was no exposure to the hazard of occupational pneumoconiosis for a continuous period of two years prior to the last exposure or for a continuous period of sixty days or more within three years prior to the filing of his said application."

The appellant here and claimant below, Huston Woodrow Meadows, is currently fifty-eight years old. He began working as an underground coal miner in 1927 when he was approximately thirteen years old and from 1927 until 1959 most of claimant's vocational time was spent underground in such positions as motorman, coal loader, cutting machine operator or general laborer. In 1959 the claimant stopped working in the coal mines and from 1959 until 1963 he worked as a janitor at the Kanawha Country Club. On April 3, 1963, the claimant was employed by the FMC Corporation at its South Charleston Ordnance Plant, where the claimant worked, except for brief periods of temporary layoff, until November 14, 1969. While employed by FMC, claimant

worked for approximately five months as a helper in the packaging and shipping department until August 1963, when he was classified as a "Helper, Fabrication, Sheet Metal" and began to work in the sheet metal department where he worked until he left FMC in 1969, except for the period from October 29, 1964 to July 25, 1965. While in the sheet metal department, the claimant performed a variety of tasks, one of which was the "deburring" of parts.

The "deburring" operation to which claimant principally attributes the dust hazard, was performed by the use of belt grinders, rotary or disk grinders, and so-called "peewee" grinders. The "deburring" operation was necessary to remove rough edges from metal that had been cut by saws or shears. The belt grinder, which was mounted on a stationary board or work bench, used an abrasive belt rotated by an electric motor. The rotary and "peewee" grinders used a carbide grind stone on a rotating shaft driven by an electric motor or compressed air. The claimant asserts that residue material in the form of a "ball of dust" was created in the deburring operation, and that the abrasive material on the rotating belt or disk was abraded into the air and became a dust residue to which claimant was exposed.

The employer maintains that the evidence presented at the hearings demonstrates that the claimant was not exposed to a situation in which he would be subject to the "inhalation of minute particles of dust over a period of time due to causes and conditions arising out of and in the course of the employment," as required by Chapter 23, Article 4, Section 1 of the Code of West Virginia, 1931, as amended.

There was substantial conflict in the evidence concerning the factual issue of the amount of dust in the work area. The claimant testified that there was a large amount of dust in the sheet metal department, and testified that the existence of a vehicle testing area in proximity to the building in which claimant worked

caused an additional dust hazard whenever the vehicles were tested on the dirt track. One witness, who was a workmate of the claimant, testified that the witness experienced dust from similar grinding, or "deburring" operations in the same work area as the claimant. The claimant's basic contention is that the effect of small particles being released into the air through the continuous contact between the metal on which the claimant was working and the abrasive materials used to perform the deburring operation, combined with similar persons in proximity to claimant performing the same operation, created a dust hazard which either caused claimant to contract occupational pneumoconiosis, or caused a perceptible aggravation of a pre-existing pneumoconiosis.

The employer introduced voluminous evidence, both from management personnel in the South Charleston plant and from outside technical experts to the effect that no unusual dust hazard was created in the area of claimant's employment. The employer's witness testified that throughout the history of the deburring operation in the sheet metal department of the South Charleston plant, there were no complaints about dust conditions. There was testimony that the plant safety committee, operating under the authority of a collective bargaining agreement, never voiced a complaint concerning employees' exposure to dust from the deburring operation. While the claimant testified that substantial dust was created at the end of the shift when compressed air hoses, ordinarily used to operate the drills, were used to blow metal chips and residue from the work benches and isles, a witness for the employer testified that this was only done during the last five minutes of the working day.

The employer introduced as a witness the Quality Manager of the Coated Abrasive Division of the Norton Company, which manufactured the abrasive belts and discs used by the claimant in the grinding operations in

question, who testified that the silicon dioxide content of the abrasive belts and discs used in the deburring operation was negligible, and that there was no danger of exposure to silicon dioxide dust. A research petrographer employed by the Norton Company testified that the exposure to silicon dioxide dust from the use of grinding wheels such as those used by the claimant was also negligible. The thrust of the employer's expert testimony was that there was a very low emission of silicon dioxide dust; however, Chapter 23, Article 4, Sections 1 and 8c, *Code of West Virginia*, 1931, as amended, which deal with occupational pneumoconiosis, speak in terms of the inhalation of "minute particles of dust" and not of exposure to silicon dioxide dust, as was required by previous statutes. The evidence appears to be uncontroverted, therefore, that there was a higher incidence of dust at claimant's work site than there would be in numerous other possible occupations.

Since a conflict in testimony concerning the dust hazard developed during the hearings, the basic issue presented upon this appeal is whether the claimant established a sufficient prima facie case of a dust hazard to entitle him to have the Commissioner refer him to the Occupational Pneumoconiosis Board for examination and recommendation pursuant to Chapter 23, Article 4, Section 8c of the *Code of West Virginia*, 1931, as amended.

This issue concerns the relationship between medical and non-medical findings, and involves the proper roles of the Commissioner and the Pneumoconiosis Medical Board. The role of the Board is established in *Code*, 23-4-8c, as amended, and the role of the Commissioner is established by *Code*, 23-4-15b, as amended. Under *Code*, 23-4-15b, "the commissioner shall determine whether the claimant was exposed to the hazards of occupational pneumoconiosis for a continous period of not less than sixty days. . . ." It is, therefore, necessary for us to determine the proper definition of a "hazard." We hold that a "hazard," as contemplated by the statute, consists

of any condition where it can be demonstrated that there are minute particles of dust in abnormal quantities in the work area. *Code,* 23-4-1, as amended, defines "occupational pneumoconiosis" as "a disease of the lungs caused by the inhalation of minute particles of dust over a period of time due to causes and conditions arising out of and in the course of the employment."

In this case the Commissioner was clearly wrong in not finding that the testimony demonstrated a "hazard," as the evidence unequivocally shows that the work area had an abnormal amount of dust, although admittedly, the dust was less than would be customary in many other industries such as coal mining.

Accordingly the ruling of the Workmen's Compensation Appeal Board is reversed and the case is remanded for the Commissioner to refer claimant to the Occupational Pneumoconiosis Board.

*Reversed and remanded.*

BERRY, CHIEF JUSTICE, dissenting:

I respectfully dissent from the majority opinion in this case for the simple reason that I do not believe the Commissioner and the Appeal Board, the fact finding bodies, were clearly wrong when they found, after proper hearings, that the claimant was not exposed to the hazard of occupational pneumoconiosis for the required statutory period of time while in the employ of FMC.

Code, 23-4-15b, as amended, provides that the Commissioner shall determine whether the claimant was exposed to the hazard of occupational pneumoconiosis. This initial finding of non-medical facts must be made by the Commissioner before the claimant is referred to the medical board. See *Douglas v. Commissioner,* 152 W.Va. 340, 163 S.E.2d 469.

The occupational pneumoconiosis board, after a claim is submitted to it, is required to make a written report to the Commissioner of its medical findings and conclusions. Code, 23-4-8c (1). The report of the board should

set forth the medical findings and conclusions as to whether the exposure was sufficient from a medical standpoint to cause occupational pneumoconiosis or to perceptibly aggravate an existing occupational pneumoconiosis. Code, 23-4-8c (2).

It is true that there was a conflict in the evidence with regard to the amount of dust the claimant was subjected to while employed by FMC. The non-medical matters were resolved by the Commissioner and affirmed by the Appeal Board that the claimant was not exposed to the hazard of occupational pneumoconiosis in the course of and as a result of his employment by FMC. The evidence of such exposure was of such nature that the Commissioner's determination was not clearly wrong and in such case this Court will not disturb the finding of fact made by the Appeal Board. *Stewart v. Commissioner,* 155 W.Va. 633, 186 S.E.2d 700; *Williard v. Commissioner,* 155 W.Va. 114, 181 S.E.2d 278.