543 S.E.2d 289

**Robert S. RHODES, Appellant,**

v.

**WORKERS' COMPENSATION DIVISION and Anchor Glass Container, Appellees.**

No. 27831.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 4, 2000.

Decided Dec. 11, 2000.

Concurring Opinion of Justice Scott Jan. 24, 2001.

Dissenting Opinion of Justice Starcher Jan. 16, 2001.

Robert L. Stultz, Wilson & Bailey, Weston, for the Appellant.

Nancy Tyler, Employment Programs Litigation Unit, Charleston, for the Appellee.

DAVIS, Justice:

In this appeal from a decision of the Workers' Compensation Appeal Board, a Workers' Compensation claimant argues that his claim for benefits for occupational pneumoconiosis was improperly denied. We find that when a

party objects to the findings and conclusion of the Occupational Pneumoconiosis Board, made in connection with a Workers' Compensation claim for occupational pneumoconiosis benefits, and submits new medical evidence in connection with the objection, W. Va.Code § 23–4–8c(d) (1993) (Repl.Vol.1998) requires the objecting party to bear the burden of questioning the Occupational Pneumoconiosis Board regarding the new medical evidence at the hearing therein required. Because this procedure was not clearly established prior to this opinion, we reverse this case and remand for additional proceedings.

## I.

## FACTUAL AND PROCEDURAL HISTORY

Robert S. Rhodes (hereinafter "Mr. Rhodes"), claimant below and appellant herein, was employed by Anchor Glass Container (hereinafter "Anchor") in Keyser, West Virginia, for approximately twenty-two years, ending in October 1995, when the plant closed.[1] On April 29, 1998, Dr. Carl Liebig diagnosed Mr. Rhodes with occupational pneumoconiosis (hereinafter "OP"). Consequently, based upon Dr. Liebig's diagnosis and Mr. Rhodes' history of workplace dust exposure, Mr. Rhodes filed a Workers' Compensation claim for OP benefits. On July 30, 1998, the Workers' Compensation Division (hereinafter "the Division") issued a nonmedical "Claim Decision" stating that Mr. Rhodes was entitled to the presumption that "any chronic respiratory disability resulted from [his] employment."[2] Mr. Rhodes was then evaluated by the Occupational Pneumoconiosis Board (hereinafter "OP Board") on September 24, 1998. The OP Board's evaluation included a patient history, a physical examination, pulmonary function studies and

an X-ray of the chest. In its report disclosing its findings, the OP Board noted that Mr. Rhodes had been exposed to a dust hazard for approximately twenty-two years as a glass plant worker. In addition, the Board stated:

> Physical examination shows the claimant to be in fair general clinical condition. He is not in any respiratory distress at rest. Chest cage is well formed. There are harsh breath sounds. There are no rales. There is mild wheezing present bilaterally. Heart sounds are of good quality with no murmurs.

> . . . .

> *X–RAY INTERPRETATION:* CHEST PA views of the chest are within normal limits in their appearance with NO EVIDENCE of occupational pneumoconiosis identified.

As a result of its evaluation, the OP Board made no diagnosis of OP.

Based upon the OP Board's failure to diagnose OP, the Division, by order dated December 3, 1998, notified Mr. Rhodes that no award of benefits was being granted. Thereafter, on January 28, 1999, Dr. Ray A. Harron interpreted the OP Board's X-ray on behalf of Mr. Rhodes. Dr. Harron indicated that the X-ray quality was grade one. His report also stated that the X-ray revealed parenchymal abnormalities consistent with pneumoconiosis, but no pleural abnormalities consistent with pneumoconiosis. Dr. Edward Aycoth also read the OP Board's X-ray on behalf of Mr. Rhodes and reported the film quality as grade one. Dr. Aycoth's report further stated:

> The heart, mediastinum, bony thorax, costophrenic angles and hemidiaphragms are within normal limits.

---

1. Mr. Rhodes was employed in Anchor's batch and tank department.

2. This presumption is not conclusive. *See* W. Va.Code § 23–4–8c(b) (1993) (Repl.Vol.1998):

    If it can be shown that the claimant or deceased employee has been exposed to the hazard of inhaling minute particles of dust in the course of and resulting from his or her employment for a period of ten years during the fifteen years immediately preceding the date of his or her last exposure to such hazard and that such claimant or deceased employee has sustained a chronic respiratory disability, then it shall be presumed that such claimant is suffering or such deceased employee was suffering at the time of his or her death from occupational pneumoconiosis which arose out of and in the course of his or her employment. *This presumption shall not be conclusive.* (Emphasis added).

There are scattered rounded density opacities measuring up to 3 mm. in diameter throughout both lungs. The lungs are well aerated and free of active disease.
IMPRESSION:
Pneumoconiosis category 1/0, p/q.

Mr. Rhodes protested the Division's order granting no award of benefits for OP, and the case was submitted to the Workers' Compensation Office of Judges (hereinafter "OOJ") for review. In support of his protest, Mr. Rhodes submitted the reports of Drs. Harron and Aycoth. A hearing for the purpose of adducing the testimony of members of the OP Board was then held on August 11, 1999. The two page transcript from this hearing indicates that counsel for Mr. Rhodes was the only attorney making an appearance. No one appeared for the employer or on behalf of the Division. Counsel for Mr. Rhodes failed to question any member of the OP Board. In a total of four lines of transcript, the record simply notes the style of the case and the claim number, and states that "[t]he Claim will be submitted." Thereafter, by order dated October 8, 1999, the OOJ announced its decision affirming the Commission's order denying benefits to Mr. Rhodes. The order stated in part:

The record evidence supports the Division's Order granting the claimant no award for occupational pneumoconiosis. The Board examined the claimant on September 24, 1998, and found that the chest x-ray was within normal limits. This report is reliable and credible and supports the Division's Order. The claimant has failed to show that the findings of the Board are clearly wrong.

The claimant submitted the x-ray report of Dr. Edward Aycoth who reviewed the x-rays taken by the Board and opined that the claimant suffered from minimal pneumoconiosis. However, this report was not submitted to the Board for review and comment as required in the procedures for occupational pneumoconiosis cases. *See* 85 CSR [1,] § 20 *et seq.* At the final hearing scheduled for this matter on August 11, 1999, the claim was submitted on the existing record. Members of the Board were not requested to review the evidence submitted by the claimant and discuss the reliability and credibility of Dr. Aycoth's report. This procedure should not be circumvented. Accordingly, the Division's Order is affirmed.

Mr. Rhodes then appealed his case to the Workers' Compensation Appeal Board (hereinafter "WCAB"), seeking a statutory five percent permanent partial disability award for OP without impairment pursuant to W. Va.Code §§ 23–4–8c(b) (1993) (Repl.Vol. 1998)[3] and 23–4–6a (1995) (Repl.Vol.1998).[4] By order dated April 27, 2000, the WCAB affirmed the order of the OOJ, and incorporated the same, by reference, as its own findings of fact and conclusions of law. The WCAB also indicated that its decision was based upon its conclusion that "the Occupational Pneumoconiosis Board has specifically found that it *'cannot make a diagnosis of occupational pneumoconiosis.'* (Emphasis added.) We firmly believe that this finding is sufficient to rebut the non-conclusive presumption found in West Virginia Code § 23–4–8c(b), and justifies the Division's refusal of a 5% statutory award." Finally, the WCAB explained:

West Virginia Code § 23–4–6a mandates that "the office of judges *shall* affirm the decision of the Occupational Pneumoconiosis Board made following hearing unless the decision is clearly wrong in view of the reliable, probative and substantial evidence on the whole record." We find nothing in the evidence to show that the Occupational Pneumoconiosis Board was *clearly wrong.* To the contrary, we find that the record as a whole, even without the statutory mandate of West Virginia Code § 23–4–6a, overwhelmingly, on strong and reliable evi-

---

3. *See supra* note 2 for text of W. Va.Code § 23–4–8c(b).

4. W. Va.Code § 23–4–6a states in relevant part: [I]f it shall be determined by the division in accordance with the facts in the case and with the advice and recommendation of the occupational pneumoconiosis board that an employee has occupational pneumoconiosis, but without measurable pulmonary impairment therefrom, such employee shall be awarded and paid twenty weeks of benefits at the same benefit rate as hereinabove provided.

dence, supports the conclusion that the claimant is not entitled to a presumptive 5% statutory award. Given the deference which we are required by statute, and decisions of the West Virginia Supreme Court of Appeals, to give to the findings of the Occupational Pneumoconiosis Board and the Administrative Law Judge, we would be committing gross error to find otherwise.

It is from this April 27, 2000, order of the WCAB that Mr. Rhodes now appeals.

## II.

## STANDARD OF REVIEW

▆ This appeal primarily involves questions of law. We have previously explained that we review *de novo* questions of law decided by the WCAB.

As we said in *Barnett v. State Workmen's Compensation Com'r.*, 153 W.Va. 796, 812, 172 S.E.2d 698, 707 (1970), "[w]hile the findings of fact of the [WCAB] are conclusive unless they are manifestly against the weight of the evidence, the legal conclusions of the appeal board, based upon such findings, are subject to review by the courts." Conclusions of law are subject to de novo scrutiny. Syl. pt. 3, *Adkins v. Gatson*, 192 W.Va. 561, 453 S.E.2d 395 (1994); Syl. pt. 1, *Randolph County Board of Education v. Scalia*, 182 W.Va. 289, 387 S.E.2d 524 (1989). Where the issue on an appeal is clearly a question of law or involving an interpretation of a statute, we apply a de novo standard of review. Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995); Syl. pt. 1, *University of West Virginia Bd. of Trustees on Behalf of West Virginia University v. Fox*, 197 W.Va. 91, 475 S.E.2d 91 (1996).

*Conley v. Workers' Comp. Div.*, 199 W.Va. 196, 199, 483 S.E.2d 542, 545 (1997). To the extent that our decision in this case requires us to consider factual findings made by the WCAB, we will not reverse absent a finding that the WCAB's decision is plainly wrong.

" 'This Court will not reverse a finding of fact made by the Workmen's Compensation Appeal Board unless it appears from the proof upon which the appeal board acted that the finding is plainly wrong.' Syl. pt. 2, *Jordan v. State Workmen's Compensation Commissioner*, 156 W.Va. 159, 191 S.E.2d 497 (1972), quoting, Syllabus, *Dunlap v. State Workmen's Compensation Commissioner*, 152 W.Va. 359, 163 S.E.2d 605 (1968)." Syllabus, *Rushman v. Lewis*, 173 W.Va. 149, 313 S.E.2d 426 (1984).

Syl. pt. 1, *Conley*. We have also explained that

[T]he plainly wrong standard of review is a deferential one, which presumes an administrative tribunal's actions are valid as long as the decision is supported by substantial evidence. Syl. pt[.] 3, *In re Queen*, 196 W.Va. 442, 473 S.E.2d 483 (1996); *Frymier–Halloran v. Paige*, 193 W.Va. 687, 695, 458 S.E.2d 780, 788 (1995).

*Conley*, 199 W.Va. at 199, 483 S.E.2d at 545.

▆ Finally, it is prudent to note that "[w]hen the Workers' Compensation Appeal Board reviews a ruling from the Workers' Compensation Office of Judges it must do so under the standard of review set out in W. Va.Code § 23-5-12(b) (1995), and failure to do so will be reversible error." Syl. pt. 6, *Conley*. W. Va.Code § 23-5-12(b) (1995) (Repl.Vol.1998) also directs, in relevant part, that

[The WCAB] shall reverse, vacate or modify the order or decision of the administrative law judge if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative law judge's findings are:

(1) In violation of statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the administrative law judge; or

(3) Made upon unlawful procedures; or

(4) Affected by other error of law; or

(5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or

(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

With due regard for these standards, we now consider the issue raised on appeal.

## III.

## DISCUSSION

Mr. Rhodes is the only party who filed a brief in connection with this appeal. There has been no response from the employer, who is no longer in business, or the Division. Mr. Rhodes simply argues that the reports of Drs. Harron and Aycoth, in addition to the initial diagnosis of Dr. Liebig, provided reliable, probative and substantial evidence that he suffers from OP. Consequently, in light of the liberality rule,[5] Mr. Rhodes contends that he is entitled to the five percent statutory award for OP without impairment.

As noted above, the OOJ affirmed the Division's award of no benefits. In reaching this decision, the OOJ concluded that Mr. Rhodes had failed to show that the findings of the OP Board were clearly wrong.[6] This decision of the OOJ, which was subsequently affirmed by the WCAB and incorporated into its own order, was based in significant part upon the fact that the "[m]embers of the [OP] Board were not requested to review the evidence submitted by [Mr. Rhodes] and [to] discuss the reliability and credibility of Dr. Aycoth's report." Thus, the issue which must be addressed to resolve this appeal is whether the OP Board is required to review and comment on evidence submitted by a claimant protesting an adverse decision of the Division rendered in an OP claim after the OP Board has conducted its hearing/examination and submitted its findings and conclusions, and, if so, who bears the burden of advancing this procedure.

■ This is an issue of first impression for this Court. In order to settle it, we look to the Workers' Compensation statutes. Because those statutes do not expressly address the issue, we must endeavor to ascertain, from the text provided, what procedure the legislature intended. " ' "The primary object in construing a statute is to ascertain and give effect to the intent of the legislature." Syllabus Point 1, *Smith v. State Workmen's Compensation Commissioner*, 159 W.Va. 108, 219 S.E.2d 361 (1975).' Syllabus point 2, *Anderson v. Wood*, 204 W.Va. 558, 514 S.E.2d 408 (1999)." Syl. pt. 2, *Expedited Transp. Sys., Inc. v. Vieweg*, 207 W.Va. 90, 529 S.E.2d 110 (2000).

■ We find several of the Workers' Compensation statutes instructive to our consideration of the instant question. Thus, in conducting our analysis, we must consider together all the statutes related to this topic. " ' " 'Statutes in pari materia, must be construed together and the legislative intention, as gathered from the whole of the enactments, must be given effect.' Point 3., Syllabus, *State ex rel. Graney v. Sims*, 144 W.Va. 72[, 105 S.E.2d 886 (1958) ]. Syl. pt. 1, *State ex rel. Slatton v. Boles*, 147 W.Va. 674, 130 S.E.2d 192 (1963)." Syl. pt. 1, *Transamerica Com. Fin. v. Blueville Bank*, 190 W.Va. 474, 438 S.E.2d 817 (1993).' Syllabus point 2, *Beckley v. Kirk*, 193 W.Va. 258, 455 S.E.2d 817 (1995)." Syl. pt. 3, *Expedited. See also Carvey v. West Virginia State Bd. of Educ.*,

5. *See Crouch v. West Virginia Workers' Comp. Comm'r*, 184 W.Va. 730, 732, 403 S.E.2d 747, 749 (1991) ("As a general rule, the claimant's evidence in a workers' compensation case must be liberally construed in his favor. Moreover, this Court has stated that a claimant is entitled to all reasonable inferences that can be drawn from the evidence. *Javins v. Workers' Compensation Commissioner*, 173 W.Va. 747, 320 S.E.2d 119 (1984); *Sluss v. Workers' Compensation Commissioner*, 174 W.Va. 433, 327 S.E.2d 413 (1985).").

6. Pursuant to W. Va.Code § 23–4–6a

If an employee is found to be permanently disabled due to occupational pneumoconiosis, as defined in section one [§ 23–4–1] of this article, the percentage of permanent disability shall be determined by the degree of medical impairment that is found by the occupational pneumoconiosis board. The division shall enter an order setting forth the findings of the occupational pneumoconiosis board with regard to whether the claimant has occupational pneumoconiosis and the degree of medical impairment, if any, resulting therefrom. That order shall be the final decision of the division for purposes of section one [§ 23–5–1], article five of this chapter. If such a decision is objected to, *the office of judges shall affirm the decision of the occupational pneumoconiosis board made following hearing unless the decision is clearly wrong in view of the reliable, probative and substantial evidence on the whole record . . . .*

206 W.Va. 720, 731, 527 S.E.2d 831, 842 (1999) ("Generally, ' "[s]tatutes which relate to the same subject matter should be read and applied together so that the Legislature's intention can be gathered from the whole of the enactments." Syllabus Point 3, *Smith v. State Workmen's Compensation Comm'r,* 159 W.Va. 108, 219 S.E.2d 361 (1975).' Syl. pt. 3, *Boley v. Miller,* 187 W.Va. 242, 418 S.E.2d 352 (1992).").

 First, we note that the OP Board plays an integral role in the decision of an OP claim: "[t]he function of the board is to determine *all* medical questions relating to cases of compensation for occupational pneumoconiosis under the direction and supervision of the commissioner." W. Va.Code § 23-4-8a (1999)[7] (Supp.2000) (emphasis added).[8] *See also Newman v. Richardson,* 186 W.Va. 66, 69-70, 410 S.E.2d 705, 708-09 (1991) ("Because the Occupational Pneumoconiosis Board is composed of doctors who have 'by special study or experience, or both, acquired special knowledge of pulmonary diseases' (W. Va.Code, 23-4-8a, [1974]), the Board is to determine all medical questions in an occupational pneumoconiosis claim under the direction and supervision of the Commissioner. *Ferguson v. State Workmen's Compensation Commissioner,* 152 W.Va. 366, 163 S.E.2d 465 (1968)." (footnote omitted)).

Furthermore, the Division and the OOJ are mandated, in W. Va.Code § 23-4-6a (1995) (Repl.Vol.1998), to give substantial weight to the OP Board's determination of a claimant's degree of medical impairment:

If an employee is found to be permanently disabled due to occupational pneumoconiosis, as defined in section one [§ 23-4-1] of this article, *the percentage of permanent disability shall be determined by the degree of medical impairment that is found by the occupational pneumoconiosis board.* The division *shall* enter an order setting forth the findings of the occupational pneumoconiosis board with regard to whether the claimant has occupational pneumoconiosis and the degree of medical impairment, if any, resulting therefrom. That order *shall* be the final decision of the division for purposes of section one [§ 23-5-1], article five of this chapter. If such a decision is objected to, the office of judges *shall affirm* the decision of the occupational pneumoconiosis board made following hearing *unless* the decision is *clearly wrong* in view of the reliable, probative and substantial evidence on the whole record.

(Emphasis added). It is noteworthy that the above quoted provision repeatedly utilizes the term "shall."

The word "shall" is mandatory. *See State v. Allen,* 208 W. Va. 144, 153, 539 S.E.2d 87, 96 (1999) ("Generally, 'shall' commands a mandatory connotation and denotes that the described behavior is directory, rather than discretionary." (citations omitted)); Syl. pt. 1, *E.H. v. Matin,* 201 W.Va. 463, 498 S.E.2d 35 (1997) (" 'It is well established that the word "shall," in the absence of language in the statute showing a contrary intent on the part of the Legislature,

(Emphasis added).

7. The version of W. Va.Code § 23-4-8a in effect at the time Mr. Rhodes asserted his claim was worded slightly differently: "The function of the board *shall be* to determine all medical questions relating to cases of compensation for occupational pneumoconiosis under the direction and supervision of the commissioner." W. Va.Code § 23-4-8a (1974) (Repl.Vol.1998) (emphasis added). We find that the change from "shall be" to "is" does not materially change the meaning of the quoted language.

8. To the extent a statute is unambiguous, it is not subject to interpretation:

"[W]here the language of a statutory provision is plain, its terms should be applied as written and not construed." *DeVane v. Kennedy,* 205

W.Va. 519, 529, 519 S.E.2d 622, 632 (1999) (citations omitted). *See also* Syl. pt. 4, in part, *Daily Gazette Co., Inc. v. West Virginia Dev. Office,* 206 W.Va. 51, 521 S.E.2d 543 (1999) ("A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect." (internal quotations and citations omitted)); Syl. pt. 5, in part, *Walker v. West Virginia Ethics Comm'n,* 201 W.Va. 108, 492 S.E.2d 167 [(1997)] ("Where the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation." (internal quotations and citations omitted)).

*State ex rel. McGraw v. Combs Servs.,* 206 W.Va. 512, 519, 526 S.E.2d 34, 41 (1999).

should be afforded a mandatory connotation.' " (citation omitted)).

*Keplinger v. Virginia Elec. and Power Co.,* 208 W.Va. 11, 21–22, 537 S.E.2d 632, 642–43 (2000).

Similarly, in a case where a claimant seeks a five percent statutory award for OP without impairment, such determination is to be made by the Division *with the advice and recommendation of the OP Board:*

> [I]f it shall be determined by the division in accordance with the facts in the case and *with the advice and recommendation of the occupational pneumoconiosis board* that an employee has occupational pneumoconiosis, but without measurable pulmonary impairment therefrom, such employee shall be awarded and paid twenty weeks of benefits at the same benefit rate as hereinabove provided.

W. Va.Code § 23–4–6a [9] (emphasis added).[10]

Having observed the considerable deference afforded the OP Board, we now consider its procedural role in the processing of an OP claim. Once a claimant is referred by the Commissioner to the OP Board, *see* W. Va. Code § 23–4–8 (1990) (Repl.Vol.1998) ("If the compensation claimed is for occupational pneumoconiosis, the commissioner shall have the power, after due notice to the employer, and whenever in the commissioner's opinion it shall be necessary, to order a claimant to appear for examination before the occupational pneumoconiosis board hereinafter provided."),[11] either the Commissioner or the OP Board must then notify the employee/claimant [12] to appear before the OP Board. W. Va.Code § 23–4–8b (1971) (Repl.Vol.1998) ("The occupational pneumoconiosis board, upon reference to it by the commissioner of a case of occupational pneumoconiosis, shall notify the employee, or in case he is dead, the claimant, and the employer, to appear before such board at a time and place stated in the notice.").[13] Where the employee asserting a claim for OP benefits is living, he or she is then required to submit to an examination by, or on behalf of, the OP Board. *Id.*[14]

---

9. *See supra* note 8.

10. Additionally, we note that W. Va.Code § 23–4–6(h) (1999) (Supp 2000) states that "[f]or the purposes of [Chapter 23 of the West Virginia Code] a finding of the occupational pneumoconiosis board shall have the force and effect of an award." This Court previously examined that language in an earlier version of W. Va.Code § 23–4–6(h) and explained that the purpose of the provision is "to allow dependents to recover in those instances where the employee die[s] prior to a final ruling of the Commissioner." *Cole v. State Workmen's Compensation Comm'r,* 166 W.Va. 294, 301, 273 S.E.2d 586, 591 (1980) (citing *Charles v. State Workmen's Comp. Comm'r,* 161 W.Va. 285, 241 S.E.2d 816 (1978)).

11. *Accord* 7A C.S.R. § 85–1–20.3 (1986). *See also Newman v. Richardson,* 186 W.Va. 66, 69, 410 S.E.2d 705, 708 (1991) ("After the Commissioner determines that the exposure requirements in a claim for occupational pneumoconiosis have been met, 'the Commissioner must refer the claim to the Occupational Pneumoconiosis Board....' *Parker* [ *v. Workers' Comp. Comm'r* ], 174 W.Va. [181,] 183, 324 S.E.2d [142,] 144 [ (1984) ]; Syllabus, *Godfrey v. State Workmen's Compensation Commissioner,* 166 W.Va. 644, 276 S.E.2d 802 (1981); Syllabus Point 2, *Meadows v. State Workmen's [Compensation] Commissioner,* 157 W.Va. 140, 198 S.E.2d 137 (1973).").

12. If the employee is deceased, his or her claim may be asserted by an appropriate dependent. *See, e.g.,* W. Va.Code § 23–4–10 (1999) (Supp. 2000) (identifying persons who may receive Workers' Compensation death benefits).

13. *See also* 7A C.S.R. § 85–1–20.3 (1986) ("In the case of such reference, the Commissioner will notify the claimant and the interested employer or employers to appear before the [OP] Board at the time and place stated in the notice.").

14. In this regard, W. Va.Code § 23–4–8b (1971) (Repl.Vol.1998) states in relevant part:

> If the employee be living, he shall appear before the board at the time and place specified and submit to such examination, including clinical and X-ray examinations, as the board may require. If a physician licensed to practice medicine in the State shall make affidavit that the employee is physically unable to appear at the time and place designated by the board, such board shall, on notice to the proper parties, change the place and time as may reasonably facilitate the hearing or examination of the employee, or may appoint a qualified specialist in the field of respiratory disease to examine the claimant on behalf of the board.

Where the employee is deceased, W. Va.Code § 23–4–8b directs:

> If the employee be dead, the notice of the board shall further require that the claimant produce necessary consents and permits so that an autopsy may be performed, if the board shall so direct. When in the opinion of the

In addition, the employee and the employer are required to provide the OP Board with "all reports of medical and X-ray examinations which may be in their respective possession or control, showing the past or present condition of the employee." *Id. Accord* 7A C.S.R. § 85–1–20.3 (1986).

After completing its examination, the OP Board must then submit a written report to the commissioner detailing its findings and conclusions as to every medical question in controversy. W. Va.Code § 23–4–8c(a) (1993) (Repl.Vol.1998).[15] *Accord* 7A C.S.R. § 85–1–20.4. In addition, the OP Board must file with the commissioner all evidence, including medical reports and X-ray examinations, produced by or on behalf of an employee/claimant or employer. *Id.*[16] Thereafter, if the employee/claimant or employer files any objections to the findings and conclusions of the OP Board, then, pursuant to W. Va.Code § 23–4–8c(d), the Commissioner or the OOJ must schedule a hearing. *Accord* 7A C.S.R. § 85–1–20.5. Specifically, W. Va.Code § 23–4–8c(d) states in relevant part:

> If objection has been filed to the findings and conclusions of the board, notice thereof *shall* be given to the board, and the members thereof joining in such findings and conclusions *shall* appear at the time fixed by the commissioner or office of judges for the hearing to submit to examination and cross-examination in respect to such findings and conclusions. At such hearing, evidence to support or controvert the findings and conclusions of the board shall be limited to examination and cross-examination of the members of the board, and to the taking of testimony of other qualified physicians and roentgenologists.

(Emphasis added). Use of the mandatory term "shall" demonstrates that the OP Board is unequivocally required to appear at the hearing and must submit to examination and cross-examination.

We are persuaded by the numerous provisions discussed above that the Legislature intended that the OP Board comment on new medical evidence submitted in connection with a party's objection(s) to the OP Board's findings and conclusions. First, we note that upon the filing of objections to the findings and conclusions of the OP Board, a hearing is required at which the OP Board members must appear. The clear purpose of this hearing is to determine whether the OP Board's findings and conclusions are clearly wrong, which is the standard for reversing a decision of the commissioner thereupon based. Because the OP Board is charged with determining *all* medical questions relating to OP cases, and because of the substantial deference afforded the OP Board in connection with OP claims, when

---

board an autopsy is deemed necessary accurately and scientifically to ascertain and determine the cause of death, such autopsy examination *shall be ordered by the board*, which shall designate a duly licensed physician, a pathologist, or such other specialists as may be deemed necessary by the board, to make such examination and tests to determine the cause of death and certify his or their written findings, in triplicate, to the board, which findings shall be public records. In the event that a claimant for compensation for such death refuses to consent and permit such autopsy to be made, all rights for compensation shall thereupon be forfeited.

15. A non-exhaustive list of specific findings and conclusions that must be set forth in the OP Board's written report is found in W. Va.Code § 23–4–8c(c) (1993) (Repl.Vol.1998).

16. With regard to this procedure, we have previously explained that:

> The Occupational Pneumoconiosis Board's function is to determine, based upon their own examinations and any evidence from examinations produced by physicians on behalf of the claimant and employer, whether there is medical evidence of occupational pneumoconiosis. West Virginia Code § 23–4–8a (1981 Replacement Vol.). The Board must then submit its findings to the Commissioner in a written report. The Board's opinions as to the extent of occupational pneumoconiosis are, in the final analysis, a judgment based not only on objective factors, but also on subjective factors such as the presumption in favor of the results showing the least impairment. It is still for the Commissioner to review their findings, as well as all other evidence, to determine what percentage of disability exists. The Occupational Pneumoconiosis Board assists the Commissioner by interpreting its own test and examination results and those presented by employers and claimants from other laboratories and physicians.

*Javins v. Workers' Compensation Comm'r,* 173 W.Va. 747, 757, 320 S.E.2d 119, 129–30 (1984) (footnote omitted).

medical evidence challenging the accuracy of the OP Board's report is submitted by a party objecting to that report, the OP Board must be afforded the opportunity to review and comment on that evidence and its reliability. The Legislature has provided this opportunity in the form of the mandatory hearing. In addition, we believe the party challenging the OP Board's findings should bear the burden of questioning the OP Board regarding new medical evidence. In other words, the party challenging the OP Board's report bears the burden of establishing that his/her new evidence is reliable and demonstrates that the findings and conclusions of the OP Board are clearly wrong. Consequently, we hold that when a party objects to the findings and conclusion of the Occupational Pneumoconiosis Board, made in connection with a Workers' Compensation claim for occupational pneumoconiosis benefits, and submits new medical evidence in connection with the objection, W. Va.Code § 23–4–8c(d) (1993) (Repl.Vol.1998) requires the objecting party to bear the burden of questioning the Occupational Pneumoconiosis Board regarding the new medical evidence at the hearing therein required.

We note that, in reaching the foregoing holding, this opinion does not take away the OOJ's statutory authority to examine the evidence on the record, with due regard for the liberality rule, in reaching its decision in any given case. Rather, this opinion assures that the statutory scheme of having the OP Board examine medical evidence and comment thereon, so that the OOJ is provided a complete and adequate record [17] upon which to base its decision, will be followed.

In the instant case, the OP Board found no OP and Mr. Rhodes objected to its findings. Thereafter, a mandatory hearing was conducted pursuant to W. Va.Code § 23–4–8c(d). However, Mr. Rhodes failed to question the OP Board regarding the medical reports of Drs. Harron and Aycoth that were submitted in support of his objection to the OP Board's findings and conclusions. Because the procedure and burden set forth in this opinion were not heretofore clearly established, we find it appropriate to reverse the final order of the WCAB and remand this case for an additional hearing on Mr. Rhodes' objection to the OP Board's report in order to afford Mr. Rhodes an opportunity to meet his burden of questioning the OP Board with respect to the medical evidence he submitted in support of his objections.[18]

## IV.

## CONCLUSION

Based upon the foregoing, the April 27, 2000, order of the WCAB is reversed and this case is remanded for additional proceedings not inconsistent with this opinion.

Reversed and remanded.

---

17. The OOJ must base its decision upon its consideration of *the entire record*, which, as clarified in this opinion, must include the OP Board's comments on new medical evidence submitted in support of a protest: "Upon consideration of the *entire record*, the chief administrative law judge or other authorized adjudicator within the office of judges shall render a decision affirming, reversing or modifying the division's action." W. Va.Code § 23–5–9(c) (1999) (Supp.2000) (emphasis added). *See also* W. Va.Code § 23–5–9(b) ("Subject to the rules of practice and procedure promulgated pursuant to section eight [§ 23–5–8] of this article, the record upon which the matter shall be decided shall include any evidence submitted by a party to the office of judges, *evidence taken at hearings conducted by the office of judges* and any documents in the division's claim files which relate to the matter objected to." (emphasis added)); 7A C.S.R. § 93–1–2.3(e) (1999) ("Subject to the limitations set forth in these rules, the record upon which a protest shall be decided shall include evidence submitted by a party to the Office of Judges, *evidence taken at hearings conducted by the Office of Judges* and any documents in the Division's claim files which relate to the protest." (emphasis added)).

18. Mr. Rhodes asserts that the liberality rule requires the reversal of the final order of the WCAB. We note, however, that the liberality rule does not relieve Mr. Rhodes of his burden of proving his claim.

"Though the general rule in workmen's compensation cases is that the evidence will be construed liberally in favor of the claimant, the rule does not relieve the claimant of the burden of proving his claim and such rule can not take the place of proper and satisfactory proof." Point 3, Syllabus, *Staubs v. State Workmen's Compensation Commissioner*, 153 W.Va. 337[, 168 S.E.2d 730 (1969) ].

Syl. pt. 3, *Clark v. State Workmen's Comp. Comm'r*, 155 W.Va. 726, 187 S.E.2d 213 (1972).

Justice STARCHER files dissenting opinion in which Justice McGRAW joins.

Justice SCOTT files a concurring opinion.

SCOTT, Justice, concurring:

(Filed Jan. 24, 2001)

In a continuing trend by some members of this Court to politicize the nature of the judicial process to the ultimate detriment of the citizens and the State, the dissenting opinion advances a position in this case that would literally bankrupt the fund earmarked for occupational pneumoconiosis (OP) claims. I am dismayed by the dissenting opinion's distortion of the applicable law. As I more fully outline below, the majority decision in this case simply provides a judicial rule to bolster a procedure that employees and employers have consistently followed in Workers' Compensation litigation. It does not add any real burden to any party.

## I.

### OP Claims Procedure

The majority opinion correctly notes that when an OP claim is made, the Workers' Compensation Division (Division) must submit the claim to the Occupational Pneumoconiosis Board (OP Board). The OP Board is then charged with making a determination regarding the claim. The OP Board submits its findings and conclusions to the Division. The Division is thereafter required to make its determination of the claim based upon the OP Board's report. *See* W. Va.Code § 23–4–

6(h) (Supp.2000) ("For the purposes of [Chapter 23 of the West Virginia Code] a finding of the occupational pneumoconiosis board shall have the force and effect of an award.").

If any party objects to the OP Board's decision, as embodied in the Division's subsequent order, W. Va.Code § 23–4–8c(d) (1998) [1] *mandates* that a hearing be held before the Office of Judges for the purpose of questioning the OP Board members. The Office of Judges is *required*, under § 23–4–8c(d), to schedule a hearing, and the members of the OP Board who join in the conclusions of the Board "shall appear" at such hearing. While § 23–4–8c(d) does not expressly obligate a protesting party to question the OP Board, the statute does state that the evidence for and against the findings of the Board "shall be limited to examination and cross-examination of the members of the Board" and the testimony of other qualified physicians. It has always been the common practice for the protesting party to question members of the OP Board. Quite simply, it is the only way in which the mandatory requirement that a hearing be held can be fulfilled, and it is the only sure way that a protesting party can demonstrate that the OP Board's findings are wrong. Our system recognizes that cross-examination is the surest path to the truth.

In this case, the employee protested the OP Board's findings and the mandatory hearing was scheduled. The OP Board was

---

1. W. Va.Code § 23–4–8c(d) (1998) states:

If either party objects to the whole or any part of such findings and conclusions of the board, such party shall file with the commissioner or, on or after the first day of July, one thousand nine hundred ninety-one, with the office of judges, within thirty days from receipt of such copy to such party, unless for good cause shown, the commissioner or chief administrative law judge extends such time, such party's objections thereto in writing, specifying the particular statements of the board's findings and conclusions to which such party objects. The filing of an objection within the time specified is hereby declared to be a condition of the right to litigate such findings and hence jurisdictional. After the time has expired for the filing of objections to the findings and conclusions of the board, the commissioner or administrative law judge shall proceed to act as provided in this chapter. If after the

time has expired for the filing of objections to the findings and conclusions of the board no objections have been filed, the report of a majority of the board of its findings and conclusions on any medical question shall be taken to be plenary and conclusive evidence of the findings and conclusions therein stated. *If objection has been filed to the findings and conclusions of the board, notice thereof shall be given to the board, and the members thereof joining in such findings and conclusions shall appear at the time fixed by the commissioner or office of judges for the hearing to submit to examination and cross-examination in respect to such findings and conclusions. At such hearing, evidence to support or controvert the findings and conclusions of the board shall be limited to examination and cross-examination of the members of the board, and to the taking of testimony of other qualified physicians and roentgenologists.* (Emphasis Added).

present but its members were not questioned and the case was submitted without the benefit of the OP Board's comments on the claimant's new medical evidence. Thus, the claimant/protestant attempted to defeat the mandatory requirement of W. Va.Code § 23–4–8c(d) that a hearing be held and that the evidence be concentrated around the opinions of the members of the Board whose decision is under protest. Because such a hearing is mandatory, the majority could have required the Division, or the non-protesting party, to advance the hearing by questioning the OP Board. Instead, the majority opinion took the practical approach and adopted a procedure that employees and employers have heretofore utilized, i.e., requiring the protesting party, be it the employee or the employer, to question the Board. In other words, pursuant to the statutory process, the majority opinion simply requires that the party who protests an OP Board's decision to the Office of Judges sees to it that the hearing goes forward. Materially, this ruling changed nothing in Workers' Compensation law. It added no burden to any party to the proceeding. The dissent's assertion otherwise is wrong.

## II.

### The Dissenting Opinion Would Bankrupt the OP Fund

Should the dissenting opinion be adopted by this Court the result is crystal clear. The mere filing of a claim would reap OP benefits 100% of the time.[2] The dissent seeks to justify this disastrous approach by relying on the decision in *Javins v. Workers' Compensation Commissioner*, 173 W.Va. 747, 320 S.E.2d 119 (1984).

The dissenting opinion has done a great disservice to Workers' Compensation law by its mischaracterization of *Javins*. According to the dissenting opinion, since no evidence in this case contradicted the employee's evidence of 5% OP impairment, "under *Javins*, 'medical evidence indicating the highest degree of impairment'—5% in this case—should have been adopted to support an award for the claimant." Such a misapplication of *Javins* is unfortunate. By allowing the submission of a claim without a proper hearing, the dissent seeks to circumvent a procedure the Legislature deemed mandatory, and would prevent the Office of Judges from having a complete and adequate record upon which to base its final decision.

A proper application and correct analysis of *Javins* requires this Court to do *exactly* what the majority opinion did—remand for a hearing so that the OP Board may review the claimant's new evidence. In fact, Syllabus Point 1 of *Javins* states "that medical evidence indicating the highest degree of impairment, which is not otherwise shown, *through explicit findings of fact by the Occupational Pneumoconiosis Board, to be unreliable, incorrect, or clearly attributable to some other identifiable disease or illness*, is presumed to accurately represent the level of pulmonary impairment attributable to occupational pneumoconiosis." (Emphasis added.)

*Javins* recognizes that the OP Board has a duty to comment upon new OP evidence submitted by a party. However, the dissenting opinion seeks to ignore the plain language in *Javins* which recognizes the Legislative requirement that a protesting party present its new evidence to the OP Board. Instead, the dissenting opinion suggests that under *Javins* a full hearing is not required. To the contrary, *Javins* clearly states that once the OP Board has fulfilled its statutory duty of examining new evidence submitted by a party, and concludes that such evidence is not "unreliable, incorrect, or clearly attributable to some other identifiable disease or illness," then the medical evidence indicating the highest degree of impairment is presumed to reflect the claimant's level of pulmonary im-

---

2. The dissent is fully aware that in statutory OP claims the Division has no "interest" and therefore never appears by counsel in such litigation before the Office of Judges, the Workers' Compensation Appeal Board or this Court. The dissent is further aware that in the vast majority of statutory OP claims the employer no longer ex- ists. Because the dissent is aware of these facts, it knows that its position would subject the OP fund to wholesale raiding. I am truly disheartened by the thought of "unlawfully" opening the State's coffers by such misconstruction of a plain statute.

pairment. The Board's duty in this regard could not be fulfilled without a full hearing.

Finally, the crux of the position taken by the dissent results in automatic entitlement. Obviously, if the OP Board is denied the opportunity to comment upon the new evidence submitted by a claimant, under *Javins* the employee's evidence must *always* prevail. In essence, any employee who files a claim, protests, and then submits his or her new evidence without allowing for OP Board comment, will be awarded benefits. Employees who want to hit the "jackpot" just need to file a claim. The dissent's reality for West Virginia is a bankrupt OP fund. The sad truth is, the dissenters do not care.

I concur with the majority opinion.

STARCHER, Justice, dissenting:
(Filed Jan. 16, 2001)

Professor Larson, in his treatise on workers' compensation law, recognized that medical evidence is more of an "art" than a "science" in the context of occupational diseases. This is one of the reasons that workers' compensation agencies and courts have tended to relax substantive, evidentiary requirements in occupational disease cases. Professor Larson states that:

[I]n appropriate circumstances medical testimony need not necessarily establish specifically and positively the pathological diagnosis and etiology of a disease or condition. . . .

The advent of a large volume and variety of occupational—and particularly respiratory—diseases whose etiology ranges from the imperfectly-understood to the downright mysterious has begun to precipitate questions on the extent to which awards can be based on incomplete medical evidence as to the nature and causation of the disease . . . [I]f the physical causal sequence is sufficiently impressive, the lack of precise diagnosis or etiology can be excused.

Arthur Larson and Lex K. Larson, 7 *Larson's Workers' Compensation Law* § 128.02[2], [4] [2000]. Professor Larson also suggests that the procedural rules employed in workers' compensation claims should be relaxed, summary and informal, so as to reach a decision by the shortest and quickest route possible:

The procedural law of workers' compensation, like the substantive, takes its tone from the beneficent and remedial character of the legislation. Procedure is generally summary and informal. . . . The whole idea is to get away from the cumbersome procedures and technicalities of pleading, and to reach a right decision by the shortest and quickest possible route.

7 *Larson's Workers' Compensation Law* § 124.01. Professor Larson's conclusions were drawn from an analysis of hundreds of workers' compensation cases litigated worldwide over the last century.

The majority opinion ignores the fundamental assumption that the etiology of occupational pneumoconiosis "ranges from the imperfectly-understood to the downright mysterious," and begins with the premise that the Occupational Pneumoconiosis Board ("OP Board") is statutorily endowed with unquestionable infallibility in deciding questions regarding lung diseases. The majority opinion then goes on to create a new rule of procedure which forces the parties to engage in expensive, though likely fruitless, litigation.

I dissent to the majority opinion's creation of a new rule of procedure, which is supported neither by law nor reason, that suggests that a diagnosis of occupational pneumoconiosis can only be established with absolute, scientific precision by the OP Board—and that any opinion contrary to the OP Board's opinion is unreliable until approved by the Board itself. The rule abrogate 87 years of jurisprudence regarding how evidence is to be interpreted in workers' compensation claims, and creates a rule of procedure biased solely against the party with the burden of proof—that is, claimants.

This entire case centers on opposing interpretations of one x-ray film by several doctors. The OP Board—a panel of physicians hired to provide advice to the Workers' Compensation Commissioner—took an x-ray film of the claimant's chest on September 24, 1998. The radiologist for the OP Board examined the x-ray films and found no evidence of occupational pneumoconiosis.

The claimant procured the x-ray film from the OP Board, and sent it to two different radiologists for an independent review. Dr. Ray A. Harron read the x-ray and found abnormalities in the lungs that appeared consistent with occupational pneumoconiosis. Dr. Edward Aycoth similarly read the x-ray and found what appeared to be "scattered rounded density opacities measuring up to 3 mm. in diameter throughout both lungs," suggesting a mild degree of occupational pneumoconiosis.

"Occupational pneumoconiosis is a disease of the lungs caused by the inhalation of minute particles of dust over a period of time due to causes and conditions arising out of and in the course of the employment." *W.Va.Code*, 23–4–1 [1989]. A pneumoconiosis—such as asbestosis, silicosis, or black lung—is the irritation and scarring of the tissue of the lungs and the tissue surrounding the lungs caused by breathing in certain irritating dusts—such as asbestos, silica, or coal. The inflammation and scarring process is sometimes—though not always—visible through the use of x-ray films of the chest.

Reading an x-ray of the lungs is similar to reading a Rorschach test—different doctors look at blotches (called "opacities") on x-rays and try to measure and interpret what the blotches mean. One doctor may interpret a blotch as occupational pneumoconiosis, while another might feel the blotch is the remnant of a childhood disease. A third doctor may interpret the blotch as normal, healthy lung tissue. Only by slicing the claimant's lung into sections and examining the tissue under a microscope can an exact diagnosis be achieved—a procedure obviously not available to living claimants.

The reading of lung x-rays is therefore *very* subjective. Doctors are looking at spots and squiggles on x-rays trying to pigeonhole the spots into categories, so that the diagnosis can be conveyed in a way another doctor could understand. In the instant claim, the doctors reached two different diagnoses looking at opacities on the same x-ray. I found no evidence in the record to suggest that either interpretation was in any way unreliable.

Our rule when the opinions of doctors are in conflict is quite simple: "In all types of compensation cases, conflicts in evidence, medical or otherwise, are to be construed in favor of the claimant." *Javins v. Workers' Compensation Comm'r*, 173 W.Va. 747, 758, 320 S.E.2d 119, 130 (1984). We made clear in Syllabus Point 1 of *Javins* that when conflicting medical evidence is presented concerning the existence or degree of impairment in an occupational pneumoconiosis claim, "that medical evidence indicating the highest degree of impairment, which is not otherwise shown, through explicit findings of fact by the Occupational Pneumoconiosis Board, to be unreliable, incorrect, or clearly attributable to some other identifiable disease or illness, is presumed to accurately represent the level of pulmonary impairment attributable to occupational pneumoconiosis."

The instant case could have easily been resolved through the application of *Javins* by the Office of Judges, by the Workers' Compensation Appeal Board, or by the majority opinion. The OP Board interpreted its September 24, 1998 x-ray as showing no occupational pneumoconiosis. The claimant's doctors interpreted the x-ray as positively showing occupational pneumoconiosis, supporting a statutory 5% permanent partial disability award. Neither medical opinion was shown "to be unreliable, incorrect, or clearly attributable to some other identifiable disease or illness" by the OP Board, the Office of Judges or the Appeal Board. Hence, under *Javins*, "that medical evidence indicating the highest degree of impairment"—5% in this case—should have been adopted to support an award for the claimant.

Instead of applying this simple principle of law, the majority opinion created a new twist to the procedures that are to be used in occupational pneumoconiosis claims.[1] The majority opinion finds that because the claimant "failed" to question the OP Board,

---

1. The majority opinion created this new procedural rule without any briefing from the claimant on the issue, and without the employer or the Division even making an appearance in the appeal.

his evidence could be ignored by the Office of Judges.

First, the regulations make clear that the Office of Judges must make its decision based solely upon the evidence and testimony that the parties choose to introduce into the record:

> ... the record upon which a protest shall be decided shall include evidence submitted by a party *to the Office of Judges,* evidence taken at hearings conducted by the Office of Judges and any documents in the Division's claim files which relate to the protest.

93 C.S.R. § 1.2.3(e) (emphasis added). In the instant claim, already "in the Division's claim files" was a "document[ ] ... which relate[s] to the protest:" the OP Board's report to the Commissioner finding no evidence of occupational pneumoconiosis. The claimant then submitted to the Office of Judges evidence in the form of a report by Dr. Ray A. Harron and another report by Dr. Edward Aycoth, both finding evidence of occupational pneumoconiosis. The Office of Judges could have, and should have, made its decision solely upon this record, as its own regulations require.

Second, there is no statute or regulation I can find suggesting that the Office of Judges can reject evidence, as it did in this case, because a party declined to solicit testimony from an opposing, likely hostile witness about the evidence. I don't see how the claimant "failed" to question the OP Board, because I find no requirement in our law mandating that the OP Board be questioned about the claimant's evidence. Nowhere do the statutes or regulations quoted by the majority opinion require that the OP Board be questioned about a party's evidence.

The only statute making any mention that the OP Board submit to questioning is *W.Va. Code,* 23-4-8c(d), which specifically requires the OP Board to appear for questioning *about its own opinions.* A plain reading of the statute reveals nothing about questioning the OP Board *about the opinions of other witnesses.* The statute states, in part:

> If objection has been filed to the findings and conclusions of the board ... the members thereof joining in such findings and conclusions shall appear at the time fixed by the commissioner or office of judges for the hearing to submit to examination and cross-examination in respect to such findings and conclusions.

The majority opinion interprets the language of this statute to mean that the OP Board is not only required to submit to examination and cross-examination in respect to the findings and conclusions of the OP Board, it must also submit to examination and cross-examination in respect to the findings of the claimant's experts and the employer's experts. This interpretation adds new language to the statute.

Nowhere in *W.Va. Code,* 23-4-8c(d) does the statute require that the claimant or employer submit their evidence to the OP Board for commentary. In fact, the statute specifically prevents the parties from wasting the OP Board's time by doing anything other than questioning the OP Board or other medical witnesses. The statute continues:

> At such hearing, evidence to support or controvert the findings and conclusions of the board shall be limited to examination and cross-examination of the members of the board, and to the taking of testimony of other qualified physicians and roentgenologists.

This portion of the statute contains language of limitation, not language mandating action. The parties can do nothing at the hearing other than question the OP Board, or question other doctors, regarding the claim. The statute does not—repeat, does not—require the parties to produce their expert medical witnesses for testimony at the hearing. It also does not require the parties to question the OP Board regarding any particular piece of evidence.

Reading the language of *W.Va. Code,* 23-4-8c(d) plainly, it is obvious that the statute exists as a way to preserve the due process rights of participants in the workers' compensation system. The Commissioner and Division cannot rely upon medical advice provided by an unknown, phantom expert operating in the shadows. Due process requires that there be some mechanism whereby the parties affected by the medical advice can

question the provider. The mechanism in occupational pneumoconiosis cases is *W.Va. Code,* 23–4–8c(d). The statute mandates that the Commissioner produce his/her expert, the OP Board, for questioning, and nothing more. The parties can question the OP Board regarding its report to the Commissioner if they choose—but are not required to do so—and cannot waste the OP Board's time by litigating other questions.[2]

By creating this new, unnecessary rule of procedure, the majority opinion has unfairly complicated the resolution of workers' compensation claims in violation of the basic principles of workers' compensation law. *W.Va.Code,* 23–1–15 [1923] states that:

> The [workers' compensation] commissioner shall not be bound by the usual common-law or statutory rules of evidence, but shall adopt formal rules of practice and procedure as herein provided, and may make investigations in such manner as in his judgment is best calculated to ascertain the substantial rights of the parties and to carry out the provisions of this chapter.

"Since the passage of *W.Va.Code,* 23–1–15 in 1913, this Court has interpreted the statute to require that a spirit of liberality in favor of the claimant be employed in applying the provisions of the Workers' Compensation Act." *Thacker v. Workers' Compensation Division,* 207 W.Va. 241, 244, 531 S.E.2d 66, 69 (1999)(*per curiam*). Under the provisions of *W.Va.Code,* 23–1–15, the Division is required "in administering the workmen's compensation fund to ascertain the substantial rights of the claimants in such manner as will 'carry out justly and liberally the spirit of the act[.]'" Syllabus, *Culurides v. Ott,* 78 W.Va. 696, 90 S.E. 270 (1916).

For over 87 years, the Legislature and this Court have emphasized that the Division is required to adopt simple rules of procedure. Professor Larson's treatise, quoted earlier, indicates that most jurisdictions follow this rule of informality. Now, the majority opinion has created a rule which ignores these precedents, complicates the procedure in oc-cupational pneumoconiosis cases, and places an unfair burden primarily upon claimants.

In the instant claim, no one showed up at the OP Board hearing to represent the employer and no one showed up to represent the Division—yet the majority opinion absurdly mandates that the claimant was still required to present *his* evidence to the OP Board and solicit criticism of his own experts' reports. The majority opinion doesn't say "criticism"—it says the party "bears the burden of establishing that his/her new evidence is reliable and demonstrates that the findings and conclusions of the OP Board are clearly wrong"—but the majority opinion might as well say "criticism." To say anything else would defy a knowledge of the history of the OP Board.

The Commissioner hires the OP Board to give the Commissioner its expert opinion of whether the claimant has occupational pneumoconiosis. The claimant and the employer hire their own experts to give different opinions. But these competing medical opinions cannot be presented to the Office of Judges—who take the administrative place of both judge and jury—without the OP Board first being consulted to "approve" of a particular opinion, and more importantly, being asked to admit that it was "clearly wrong." It goes against reason—and the due process protections provided by the *Constitution*—to suggest that the OP Board must act as both judge and jury regarding whether a party's evidence proves to the Office of Judges that the OP Board's opinion was incorrect.

Lastly, the majority rule is cast as an even-handed rule affecting both claimants and employers. However, in practice, the impact of the rule falls almost exclusively upon claimants, because the OP Board has an unwritten rule that occupational pneumoconiosis causes permanent, irreversible, and unchanging impairment. If a claimant is tested twice, and one test shows low impairment and another test shows high impairment, the OP Board concludes that the claimant has the low degree of impairment. The OP Board reasons that the difference be-

---

**2.** For instance, the parties could not litigate the question of the chargeability of an employer for a claim before the OP Board—unless the charge-ability questioned hinged upon medical testimony within the OP Board's expertise.

tween the low and high degree of impairment must have been the result of non-occupational causes (like asthma or some other, elusive "bronchospastic disease").

The majority opinion's rule falls more heavily on claimants because claimants bear the burden of proving that the claimant suffers from a percentage of impairment higher than that found by the OP Board. Under the OP Board's unwritten rule that the lowest degree of impairment is always correct, and higher degrees of impairment must be the result of non-occupational causes, the claimant can almost never win. Even if the claimant has hired a dozen doctors who say in sworn affidavits that the claimant's higher test results are reliable and accurate, if the OP Board decides to say the test results are not reliable—well, then the claimant loses.[3] If the claimant's evidence doesn't change the OP Board's opinion, again, the claimant loses. The OP Board gets to be judge and jury of its own opinions and any evidence which conflicts with its opinions.

Conversely, the employer can much more easily afford to repeat the tests performed by the OP Board. If the results show a lower percentage of impairment, the OP Board usually takes the position that the employer's tests are "more reliable" and therefore changes its opinion to reflect the lower percentage of disability. *See Thacker v. Workers' Compensation Division*, 207 W.Va. 241, 531 S.E.2d 66 (1999) (*per curiam*) (OP Board found 15% impairment, but later reduced award to 5% impairment finding the

employer's test evidence showing lower impairment to be "the most reliable and accurate study.")[4] Again, the OP Board relies upon its unwritten—and under *Javins,* illegal—theory that the medical tests showing the least degree of impairment are presumed to be correct.

The result of the majority opinion's new rule is that claimants have an almost impossible task of getting the OP Board to both declare that the claimant's evidence is reliable and declare that the OP Board was wrong. Employers, meanwhile, can repeat the OP Board's test to come up with a "more reliable," lower degree of impairment, or introduce some other medical records which might suggest to the OP Board that the claimant's impairment is caused by something other than occupational pneumoconiosis. In sum, it is now easier to reduce than it is to increase an occupational pneumoconiosis award.

I therefore respectfully dissent to the majority's opinion.

I am authorized to state that Justice McGRAW joins in this dissent.

---

**3.** Experience reading the records of the thousands of workers' compensation cases presented to this Court on appeal indicates that the OP Board is a slippery eel which refuses to be pinned down.

For example, medical treatises often state that "rales" or "crackling" sounds in a patient's lungs is suggestive of permanent, irreversible occupational pneumoconiosis. The members of the OP Board, however, take the unwritten position that rales are evidence of an undefined "bronchospastic disease" caused by non-occupational sources (like asthma, a chest cold, or smoking).

If the OP Board finds rales in its examination, it often attributes any of the claimant's breathing impairment to non-occupational causes other than pneumoconiosis—meaning the claimant gets no award. If the claimant's doctor does an examination and finds rales, and then imputes the rales to occupational pneumoconiosis, the OP

Board can find the doctor's opinion is unreliable because it conflicts with the OP Board's unwritten medical theories. Conversely, if the claimant's doctor finds no rales in a clinical examination, then the OP Board will declare that the claimant's doctor has proven the OP Board's point that the claimant has a disease which "comes and goes"—like asthma—and that the OP Board's conclusion that the claimant has no occupational pneumoconiosis is correct and the doctor's opinion is incorrect and unreliable.

**4.** Interestingly, the OP Board usually changes its opinion because it finds that the employer's tests are "more reliable"—not because the OP Board finds its first opinion was "clearly wrong." I fail to understand how the Office of Judges can tolerate this discrepancy.